Filed 8/20/15 (second of two modifications; first modification and unmodified opn. follow)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PATRICIA SOTO et al., | B252995 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC432930 and JCCP 4674) |
| v. | |
| BORGWARNER MORSE TEC INC., | MODIFICATION OF OPINION |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on July 15, 2015, is modified as follows:

On page 4, under the heading: 1. Mesothelioma & Asbestos delete the third sentence: Mesothelioma is a "dose-dependent" disease; every exposure to asbestos fibers during the course of one's life contributes to its development.

_____
EPSTEIN, P.J.                     MANELLA, J.                     COLLINS, J.

Filed 7/15/15 Certified for publication 8/5/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PATRICIA SOTO et al., | B252995 |
| Plaintiffs and Appellants, | (Los Angeles County |
| v. | Super. Ct. Nos. BC432930 and JCCP 4674) |
| BORGWARNER MORSE TEC INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert H. O'Brien, Judge. Affirmed in part and reversed in part.

The Arkin Law Firm, Sharon J. Arkin; Farrise Firm, Simona A. Farrise, for Plaintiffs and Appellants.

Selman Breitman, Jerry C. Popovich; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Joshua S. Lipshutz, and Joseph C. Hansen, for Defendant and Appellant.

Fred J. Hiestand, Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

Secundino Medina died of asbestos-related mesothelioma. Medina's estate, his daughters Patricia Soto, Yolanda Isaak, and Leticia Medina, and his great-grandson Eli

Canett asserted claims for negligence, strict liability, and wrongful death against a host of defendants, alleging that their asbestos-laden products contributed to Medina's mesothelioma. Their claims against defendant BorgWarner Morse TEC INC. ("BWMT"), as successor-by-merger to Borg-Warner Corporation, proceeded to a bifurcated jury trial.

During the liability phase, the court granted BWMT's motion for partial nonsuit as to Eli's[1] claims on the ground that Eli lacked standing to bring a wrongful death action under Code of Civil Procedure section 377.60, subdivision (c). The other plaintiffs' claims moved forward, and the jury ultimately found that BWMT's negligence was a substantial factor in causing Medina's death and allocated 35 percent of the total fault to BWMT. By special verdict, the jury awarded economic damages of $60,000 to Medina's estate and $130,455.70 to each of Medina's daughters. The jury further awarded $2,000,000 to each of Medina's daughters for their noneconomic losses. After hearing evidence of BWMT's financial condition and Medina's pain and suffering during the second phase of trial, the jury awarded Medina's estate $32,500,000 in punitive damages. The court entered judgment in plaintiffs' favor after denying BWMT's motions for judgment notwithstanding the verdict and for a new trial. The parties timely filed a total of three appeals and cross-appeals.

Eli appealed the court's grant of nonsuit. He contends that substantial evidence showed that he was dependent on Medina for one-half or more of his support, thereby conferring upon him standing to assert wrongful death claims. We disagree and affirm the trial court's ruling granting nonsuit.

BWMT filed a cross-appeal challenging the noneconomic damages awarded to Medina's daughters and the punitive damages awarded to his estate. We affirm the noneconomic damages awards, which we conclude were amply supported by the record and were not the product of passion or improper evidence. We reverse as to the punitive

---

[1] We refer to the plaintiffs and their relatives by their first names to avoid confusion. No disrespect is intended.

damages, however, because plaintiffs' limited evidence of BWMT's financial condition was not sufficient to sustain an award of punitive damages.

Plaintiffs also filed a cross-appeal. In it, they challenge the jury's allocation of fault. They contend that there was no substantial evidence to support the jury's finding that non-party American Smelting and Refinery Company ("ASARCO") was 25 percent responsible for causing Medina's mesothelioma. We disagree and affirm.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. *Pretrial Proceedings*

In December 2009, Medina was diagnosed with mesothelioma, a type of cancer usually caused by exposure to asbestos. He filed a personal injury complaint against numerous defendants in March 2010, alleging causes of action for negligence, breach of implied warranty, strict products liability, fraud/failure to warn, and conspiracy to defraud/failure to warn. Medina preserved his testimony in video-recorded depositions taken before his death on July 4, 2010.

On November 12, 2010, Medina's three adult daughters, Patricia Soto, Yolanda Isaak, and Leticia Medina, filed an amended complaint, adding claims for wrongful death and survivorship to the claims asserted by Medina's estate. They added Medina's great-grandson Eli Canett as a plaintiff on January 12, 2011, on the theory that he was a minor residing in Medina's household and was preponderantly supported by Medina at the time of his death. (See Code Civ. Proc. § 377.60, subd. (c).)

Plaintiffs' claims against BWMT proceeded to a bifurcated jury trial in July 2013. (See Civ. Code § 3295, subd. (d).)

### B. *Liability Phase of Trial*

Although BWMT vigorously disputed at trial that asbestos released from its predecessor's products contributed to Medina's mesothelioma and death, it does not presently contest the jury's findings that its predecessor's asbestos-containing products and negligence were substantial factors in causing Medina's death. It likewise does not contest the economic damages awarded to Medina's daughters and estate. We accordingly provide only a limited overview of the facts pertinent to those and other

3

uncontested issues and devote the bulk of our recitation to the facts most germane to the issues presented in the instant appeal and cross-appeals.

### 1.    Mesothelioma & Asbestos

Mesothelioma is a rare cancer of the mesothelial cells of the pleura, a "Saran Wrap"-like membrane that "makes the lungs airtight balloons." Mesothelioma is caused by the inhalation of all types of asbestos fibers, including chrysotile asbestos. Mesothelioma is a "dose-dependent" disease; every exposure to asbestos fibers during the course of one's life contributes to its development. Mesothelioma typically is diagnosed 10 to 80 years after exposure to asbestos fibers. Medina was diagnosed with mesothelioma in 2009 at the age of 78 or 79. There was no dispute that Medina's mesothelioma was caused by breathing air contaminated with asbestos fibers.

### 2.    BWMT

BWMT is the successor-by-merger to Borg-Warner Corporation. Borg-Warner Corporation's Borg & Beck Division ("Borg & Beck") riveted automobile clutch facings containing chrysotile asbestos to metal clutch plates, thereby producing asbestos-containing automobile clutches for passenger cars. Borg & Beck sold these asbestos-containing clutches to General Motors, which installed them in newly manufactured manual-transmission automobiles. At all times prior to 1982, all of the clutches Borg & Beck sold to General Motors contained asbestos. Borg & Beck stopped making asbestos-containing clutches sometime between 1982 and 1988.

### 3.    Medina's Relevant Exposures to Asbestos

#### a.    Exposure at General Motors

Medina worked at a General Motors assembly plant in Van Nuys from 1959 to 1988. From 1959 to 1975, he worked as a painter and painting supervisor in the "final process" or "final repair" portion of the 26-mile assembly line, where cars with imperfections were tuned up to pass final inspection.

From 1975 until his retirement in 1988, Medina worked as a security guard at the plant. As a security guard, Medina was assigned to walk around the plant, particularly after he became a supervisor in 1983. He stopped and chatted with some of his old

4

friends who still worked in the final process area, including Evan Gooch, whose duties as a "heavy hoist, heavy repair" man included replacing damaged clutches. Gooch testified that clutches in the newly manufactured cars became damaged due to "operator error" along the assembly line or as the cars were being driven out of the plant for shipment.

Gooch testified that ground-down friction material on a damaged clutch left a fine dust in the bell housing that contained the clutch. Gooch used a high-pressure air gun to blow out the dust, which clouded the air before settling on the floor. Some of the dust was captured by a ventilation system. Gooch blew the dust that settled on the floor into the aisle with his air gun. Sweepers came by after every shift to "sweep the aisles and take it away." The sweepers, which only cleared about 95 percent of the debris in the aisles, would throw dust into the air as they passed.

Gooch performed about 90 percent of the clutch work in the final process area. On average, he replaced about 15 damaged clutches per week, about two to three per shift. Most, if not all, of the clutches he saw had "Borg and Beck" stamped or embossed on the metal hub in the center.

Gooch could not recall a specific instance when Medina was present during the dust-clearing process but recalled him being present in the resultant dusty conditions. Gooch remembered talking with Medina while Gooch was replacing clutches; Medina stood alongside him, about two to three feet away. When Medina was around, Gooch "could stop and BS" with him. Gooch could not recall precisely how often Medina came through the final process area. Sometimes Gooch would not see Medina at all for several days, and other times he saw Medina four or five times in a single night.

Plaintiffs' expert Dr. William Longo, a doctor of material science and engineering, opined that Medina was exposed to "significant levels of asbestos fiber" from Borg-Warner products during his tenure at General Motors, specifically during his 13 years as a security guard. Plaintiffs' expert Dr. Barry Horn, a pulmonologist critical care specialist, opined that Medina's occupational exposure to asbestos at the General Motors plant caused his mesothelioma. Dr. Horn further opined that Medina's exposure to asbestos from Borg-Warner's asbestos products was a substantial factor in causing his

5

death, and that all of Medina's lifetime exposures to asbestos, "each of them in and of themselves," were a substantial factor in causing his mesothelioma.

### b. Potential Exposure at ASARCO

Medina's father began working full-time as a laborer at an ASARCO smelting plant in El Paso, Texas in 1940 or 1941, when Medina was about 10 or 11 years old. According to Medina, his father's duties included feeding bins of raw materials to the furnace and performing general clean-up tasks. Medina hugged his father every day when his father returned home from work. Medina recalled his father "always rubbing heavy dirt" off of his work clothes, which he often wore home. Medina described the dirt both as "not dusty, but just you put your hands on him and it was there," and "like heavy dust."

Medina lived with his father until about 1946 or 1947, when he struck out on his own to drive a taxi and serve in the Air Force. Medina's father got him a job as a laborer at ASARCO when he returned to El Paso with his wife and infant daughter Yolanda in 1955. Medina worked as a laborer at ASARCO for three years, until he was laid off as part of a reduction in force in 1958. He never received any training regarding the hazards of asbestos.

As a laborer, Medina opened bins of dirt and shoveled the dirt onto conveyors running to the smelting furnaces. He also performed general clean-up tasks such as sweeping with a push broom in the furnace house, boiler house, and machine shop. Medina saw other workers removing and replacing insulating firebrick from inside the furnaces and the outsides of the boilers, typically with hammers and crowbars. Medina also saw other workers mix cement to use in replacing firebrick, and some different cement used to patch holes in the wall and around pipes. He breathed in the dust from the cement but did not mix it himself or recall anything about the bags the cement came in other than their tan color and heavy 60-to-100-pound weights. His duties included removing empty bags of cement mix from the area and sweeping up the debris and dust generated by the removal, repair, and replacement of firebrick. Beginning in about his second year at ASARCO, he wore a paper or rubber filter mask with a "little rag over it,"

6

but still inhaled so much dust and dirt that he and other workers would "have contests to see who could spit the blackest and the furthest." Medina testified that both he and his father were "dirty and dusty" after work, "both covered with dirt, spitting black."

Medina also breathed in dust when he was assigned to clean up debris generated by workers using utility knives to cut off and replace insulation on pipes in the furnace and boiler houses. This did not happen frequently because he was not assigned to that area often and the insulation lasted a long time. The insulation was "some kind of material that was then wrapped with - - in tinfoil or something like that." One side of the covering was black and the other was silver like tinfoil. The inside was yellow and thick, not chalky, and the pieces of insulation were shaped "like blankets." Workers cut new insulation pieces to size and wrapped them around the pipes.

Plaintiffs' expert Dr. Longo opined during plaintiffs' case-in-chief that Medina's father "maybe" exposed Medina to asbestos when he worked as a laborer at ASARCO during Medina's youth. Dr. Longo testified that although he had "worked on cases in that plant," and knew that ASARCO "has asbestos-containing products," he did not "have quite enough information exactly what the dad did" to come to a definitive conclusion. Similarly, Dr. Longo opined that Medina "had the potential" to be exposed to asbestos in the course of his own three-year tenure at ASARCO. Dr. Longo testified that he "didn't see that [Medina] actually had any hands-on exposure to asbestos." Dr. Longo continued, "[i]f [Medina] was around people who were using asbestos-containing products or removing them, yes, he would have. If he was not around them, no." Dr. Longo testified that "[t]here [was] asbestos-containing material there" at the ASARCO plant, "thermal insulation, but there also is other non-asbestos-containing products." He explained that he could not definitively conclude that Medina was exposed to the known asbestos-containing-products at ASARCO without more information because "[y]ou have to put Medina using the product or around others using the product."

On cross-examination, Dr. Longo opined that in the 1940's and 1950's, ASARCO likely had thermal insulation in place, and conceded it was "possible" that some of those products likely contained amphibole asbestos fibers. He further agreed that sweeping up

7

"thermal insulation, pipe covering" and "picking up and removing empty 100-pound bags of insulating cement" at ASARCO would be a "potential exposure source," but stated that sweeping up broken firebrick would not. He testified that a study showed "insulating cement" releases asbestos fibers when it is poured or mixed. On redirect, Dr. Longo testified that the ASARCO plant was "huge" and reiterated that he would need more information about where any asbestos was and where Medina was in the facility before he could conclude that Medina was exposed to asbestos there.

BWMT explored the issue of Medina's potential asbestos exposure at ASARCO with plaintiffs' other expert witnesses during cross-examination. Dr. Barry Castleman, a doctor of occupational environmental health policy with a specialty in toxic substances control, agreed that the types of tasks Medina engaged in at ASARCO "had the potential to expose [him] to asbestos-containing products," "if the materials you're talking about actually had asbestos." Dr. Castleman conceded that it was "probably true" that "a majority of the thermal insulation products used in the United States did, in fact, contain asbestos" in the 1950's. Dr. Castleman also characterized "pipe covering and block insulating cement" as "thermal insulating products." On redirect examination, Dr. Castleman agreed with plaintiffs' counsel that there was nothing in the scientific literature to suggest that a worker who was "exposed to dirt which was being put into the smelter, to make bullets," would have been exposed to asbestos. On recross-examination, he testified that no dust mask would have been 100 percent effective at preventing exposure to asbestos.

BWMT also asked Dr. Horn about Medina's possible exposure to asbestos at ASARCO. Dr. Horn agreed that Medina's work "cleaning up thermal insulation that others had removed from pipes and . . . clean[ing] up empty 100-pound bags of insulating cement . . . contributed to his risk of mesothelioma" "if the insulation materials were asbestos and that insulating cement was asbestos." He offered the same opinion with respect to the second-hand exposure Medina may have received from his father.

BWMT read into the record Medina's responses to contention interrogatories outlining his alleged exposure from his and his father's work at ASCARCO. During

8

cross-examination of Dr. Longo, BWMT characterized these interrogatory responses as detailing "the types of exposure he [Medina] believed he had to asbestos at ASARCO." Similarly, during cross-examination of Dr. Horn, BWMT indicated that the interrogatories outlined the "types of exposure he [Medina] claims to have had while working at ASARCO."

BWMT's expert Dr. Andrew Churg, an anatomic and experimental pathologist, testified that, "[b]ased on the information [he was] provided from the Medina family's answers to interrogatories," he understood that Medina worked at ASARCO and "had been exposed potentially to amphibole fibers [a type of abestos] while working at ASARCO." Dr. Churg further opined, based on the records provided to him, "if his father was exposed to amosite or crocidolite at ASARCO and brought his work clothes home and had them laundered at home, that's a potential source of exposure to Medina himself." On cross-examination, Dr. Churg opined that "dirt exposure . . . did not cause his mesothelioma."

Another BWMT expert, Dr. Patrick Hessel, an epidemiologist, testified that he understood from Medina's testimony and interrogatory answers that his job at ASARCO "was to clean up the place." Based on that understanding, and his familiarity with epidemiological studies "that have looked at thermal insulation and the risk of mesothelioma among people who are exposed to thermal insulation," Dr. Hessel opined that Medina's work and tasks he performed at ASARCO increased his risk of mesothelioma. Dr. Hessel further opined that epidemiological literature indicates that people who work "near and are close enough to be exposed" to thermal insulation or insulating cement are at increased risk of mesothelioma.

BWMT presented its final expert, industrial hygienist Dr. William Krebs, with a hypothetical involving a laborer who worked at an ASARCO smelting plant in El Paso, Texas, from 1955-1958, "cleaned up after people removing and installing asbestos-containing thermal insulation," "removed hundred pound bags of insulating cement and cleaned up after fire brick had been removed from furnaces and boilers." Based on that hypothetical, Medina's "own testimony, which goes beyond a little bit . . . the

9

hypothetical," and his own knowledge "of the insulating materials that are used in those kinds of operations," Dr. Krebs opined that "the way that he was handling them, gave me the suggestion that he clearly could have been excessively exposed to amphibole minerals which would have resulted - - which potentially could have resulted in the development of the disease he's contracted."

### 4. Medina's Living Situation & Support of Eli

In April 2007, Medina's granddaughter Aviana Canett, her husband, Gabriel Canett, and their young son Eli moved from their mobile home into Medina's three-bedroom mobile home. Aviana testified that the move was not due to financial necessity; she and Gabriel were both employed (she had two jobs, he had one) and had been covering their own mortgage, lot rent, utilities, television, childcare costs, transportation, and other living expenses such as food and clothing for Eli prior to the move. Aviana testified that Medina asked them to move in to keep him company. Gabriel further testified that they "wanted to help him out in the same sense as he wanted to help us out." The Canetts lived with Medina continuously until his death in July 2010.

Initially, the Canetts gave Medina approximately $250 per month toward his $358 monthly lot rent, but Medina stopped regularly accepting the payments soon thereafter. Aviana testified that he "probably" let them pay "about four times a year." Medina also paid for all of the utilities except satellite television, for which the Canetts paid $90 per month. When the Canetts sold their mobile home, Medina would not let them repay the $10,000 he had given them for a down payment; he told them to save the money to buy a house.

Aviana explained there was no formal division of food expenses. Medina "would just leave and come back with bags full of stuff from the grocery store." "It was the type of thing where whoever just went to the store went and just brought home food. It wasn't, like: Hey, it's your turn to go get food. It was: Hey, I'm going to the store. I'll be back. And we would all take turns just getting food." "Whoever decided to go went and paid." Medina also sometimes purchased clothes for Eli and "would just come home with stuff" like clothes and shoes for Eli, even though Aviana and Gabriel did not know he was

10

going to do so.  He also bought Eli some toys and books.  Aviana testified that Medina "liked to just make sure everybody was taken care of."

Eli attended a pre-preschool program from 9:00 a.m. to 3:30 p.m. three days a week.  Medina sometimes dropped Eli off and always picked him up.  He watched Eli on the two weekdays that Eli was not in pre-preschool and every night that Aviana worked her second job and Gabriel worked overtime.   Medina took Eli to the donut shop, the park, and church.  Gabriel testified that "taking care of Eli" was "the majority of him helping us out."  "He devoted his time for Eli when Eli got off school or when he had to watch Eli."  When Medina got sick, Gabriel had to turn down overtime to care for Eli or ask his own parents to watch Eli.  Gabriel testified that his inability to work overtime "cut a lot for me and my wife."

At trial, Aviana testified that "every once in a while," maybe twice a month, Medina paid Eli's pre-preschool tuition of approximately $100 to $150 per week.  However, she said during her deposition that, "as far as paying for stuff," Medina did not "ever give any financial gifts to Eli."  Aviana claimed Eli as a dependent on her personal income taxes; Medina did not claim Eli as a dependent on his personal income taxes.  Medina also answered an interrogatory asking whether any children or relatives were financially dependent upon him with "not applicable," although he indicated that his "investigation and discovery are continuing and ongoing."

After Medina's death, Aviana and Gabriel bought a house and had a second child.  Aviana testified that they would not have been able to save up for the house or continue Eli's private school education without Medina's help.  Aviana further testified that home ownership and the addition of a second child made it "financially . . .  a little harder to pay for everything."  Nonetheless, she and Gabriel were still able to meet Eli's "financial needs," including keeping him fed, clothed, and enrolled in private school.

### 5.      Medina's Diagnosis and Decline

Medina testified that prior to his diagnosis with mesothelioma, he "was in great health."  His daughter Leticia testified that she always told her sisters that Medina "was healthier than them two put together," and his daughter Patricia testified that he "had

11

more energy than me" and "was just not his age." Medina went to the gym every day and worked out "all the time," took care of his house and his daughter's house, and cared for Eli. He did not take medication and was able to walk unassisted.

In 2009, Medina started losing weight, feeling tired, and coughing a lot. He thought he hurt his ribs at the gym. His doctors thought he had pneumonia. Medina went to the emergency room with pain in his chest, where he was given pain medication and told that his lung was full of water. A few weeks later, doctors drained two and a half bottles of bloody fluid that "looked like Pepsi Cola" from his lungs. They also looked in his chest with a camera and "scraped" tissue to conduct pathology tests. In July or August of 2009, doctors "shut . . . off" one of his lungs by coating the lining with a powder, relieving his pain but rendering the lung useless. Medina visited what he described as a "parade" of specialists, who ultimately concluded he had mesothelioma. His daughter Patricia got a second opinion from UCLA confirming the diagnosis.

Medina tried one round of chemotherapy but it made him feel like he was going to throw up all the time. He became sicker and started to "hurt all over, joints, shoulders, arms." After that, his doctors referred him to a palliative care doctor and a hospice program. He started taking Vicodin for his pain, and his breathing became shallow and more frequent. He began having difficulty eating and digesting food and going to the bathroom. His doctors put him on oxygen, which he used during at least one of his videotaped deposition sessions. He regressed from using a cane to a walker to a wheelchair before becoming bedridden.

Eventually, Medina's family members and hospice nurses had to care for him around the clock, giving him medication, bathing him, and changing his diapers. In the months between his diagnosis and death, Medina's weight declined precipitously. Medina died on July 4, 2010, in his home and in the presence of his family. The parties stipulated that Medina's medical expenses were $21,301. Forensic economist Robert Johnson opined that the normal life expectancy of a 79.55-year-old man like Medina would have been an additional 8.22 years.

BWMT objected to much of the evidence concerning Medina's decline in health as irrelevant and unduly prejudicial during the liability phase of trial. It filed a motion for mistrial after the jury heard Patricia's testimony and viewed Medina's videotaped depositions depicting his rapid physical decline. The court denied the motion on the grounds that, "for some purpose, some of his pain and suffering might be admissible," "the punitive damages is allowed and one of the elements to consider is the harm to the decedent," and "in effect the limit of damages is taken care of in the jury instructions."

After the court denied its mistrial motion, BWMT objected to the introduction of Gabriel's testimony on similar grounds. Plaintiffs argued that Gabriel's anticipated testimony regarding Medina's pain and suffering was relevant for both punitive damages and to demonstrate "the economic value of what it took to take care of him," that is, as "evidence about what the services were that were needed to care for him because of his disability." BWMT argued that evidence of Medina's pain and suffering was not relevant until the punitive damages phase of the bifurcated trial. Plaintiffs conceded that their proffered evidence regarding economic damages was "closely connected" to pain and suffering. The court noted that Gabriel's anticipated testimony brought plaintiffs "dangerously close to getting into evidence, in some way, pain and suffering of the decedent, which is not recoverable as a general rule." The court nonetheless permitted Gabriel to testify about "[h]elping out Grandpa towards the end," including giving him morphine, changing his diapers, lifting him up, and watching his bedroom transform into a hospital room.

### 6.    Effect of Medina's Death on his Family

All three of Medina's daughters provided emotional testimony about their relationships with their father and the effect his death had on them. His youngest daughter, Patricia, testified that she had a "pretty close relationship" with Medina when she was growing up. Patricia thought of herself as "kind of the son he never had": Medina took her fishing and camping, played chess and poker with her, and taught her basic household maintenance, woodworking, and gardening. As she grew up, Patricia continued to have a close relationship with her father. He helped her "find [her] way as

13

an adult" and was "always there to give [her] advice." She lived two blocks away from Medina for much of her adult life and talked with him about "[a]nything and everything," including her kids, work, and any issues she was having. Medina helped her with "the wisdom of raising kids" and was very involved in her four children's lives as they grew up. Patricia also testified that prior to Medina's diagnosis, he was energetic, healthy, and "very young for his age." During Patricia's battle with breast cancer in 2008 and 2009, Medina "was the one that was strong, and he provided a lot of wisdom and just comfort." Even while he was in decline from his own illness, Patricia testified, Medina "was worried about us and how we were dealing with this. . . . [H]e was still trying to comfort us and give us advice and telling us not to worry." Patricia testified that when Medina died, she felt like "a 47-year-old orphan all of a sudden" because "the most important part of [her] whole life was gone." At the time of trial three years after Medina's death, Patricia still occasionally felt "lost."

Medina's middle daughter, Leticia, also testified that she had a close relationship with her father, whom she described as "fun and always there." Like Patricia, Leticia "considered [her]self the boy out of the two girls, the other two girls" and learned a lot of "handyman-type work" from her father. Leticia moved out of the family home after she graduated from high school, but she moved back several times "during periods of breakup or divorce." Medina would help her "get back on [her] feet" and "emotionally encourage [her] to move on." He also took in Leticia and her children for about a year when her husband had to care for his ailing mother. Leticia eventually moved to Las Vegas, but still talked to Medina "all the time." Medina moved to Las Vegas for about six months to work with Leticia in the property management business, and came to visit her every year for her birthday, even when he was ill. Leticia testified that "everybody looked to him for advice and everybody told him their problems and everything," and "until the end, he was still trying to help people." She described Medina as "the glue that held everybody together." Since Medina's death, Leticia "no longer ha[s] that person to talk to every week," "that support system."

14

Medina's eldest daughter, Yolanda, had a close relationship with Medina dating back to her childhood, when he took her camping, showed her how to change tires and belts on a car, and taught her how to build things and do electrical repairs. Yolanda lived a block away from her father for the last 15 to 20 years of his life and saw him almost every day. He had a key to her house and frequently stopped in to visit. She described Medina, whom she called "Daddy," as her "confidant," "best friend," "rock," "security," and "shoulder to cry on," particularly after her husband died in 2005. Yolanda described Medina as a very happy and friendly person who always made the family smile and laugh. Yolanda testified that since her father's death, her "rock is gone and it's been very, very hard on" her. She missed talking to him about everything and listening to his suggestions. Yolanda testified that no one in her life, including her sisters, had been able to fill Medina's role as her confidant and advisor.

### 7. Plaintiffs' Closing Argument

Without any objection from BWMT, plaintiffs' counsel made a variety of emotionally charged arguments during closing. She contended that BWMT "knew they were poisoning workers, poisoning bystanders to workers, contaminating clothing that would be driven home to family members and killing wives and children," "participated in what was a mass poisoning of entire populations of people," and moved operations to South America to "make sure [its] gravy train, which was selling poison, would not be cut off." Plaintiffs' counsel urged the jury to award plaintiffs "a big pile of money," starting at $50 million. She implored the jury to consider the testimony about Medina "going to the doctors, going to chemotherapy therapy [*sic*], becoming fatigued, falling, being a fall risk and people having to help him up, take him to the bathroom" when evaluating the financial and economic value of the care he received during his illness. However, she also cautioned the jury that it could not "award or even consider any amount of money that would replace his pain and his suffering."

### 8. Jury Instructions and Special Verdicts

15

As it indicated it would when ruling on BWMT's motion for mistrial, the court instructed the jury not to consider "plaintiffs' grief, sorrow, or mental anguish" or "Medina's pain and suffering" when determining plaintiffs' loss.

BWMT asked the court to include in the instructions the names of several of the defendants named in plaintiffs' amended complaint for purposes of apportioning liability to those entities. Plaintiffs submitted a competing instruction, ultimately given by the court, that "only add[ed] in General Motors and ASARCO." Accordingly, the jury was instructed that it could allocate some responsibility to nonparties ASARCO and General Motors if it found that BWMT proved the negligence or fault of those entities was a substantial factor in causing Medina's harm. The court denied plaintiffs' request to include additional questions about ASARCO's and General Motors' negligence on the special verdict form. The "allocation section" of the special verdict form consequently read, "If 100% represents the total fault that was a substantial factor in causing Secundino Medina's death, what percentage of this 100% was due to the fault of Borg-Warner Corporation or others listed below who you have determined was a substantial factor? (The total fault allocations below must add up to 100%.)"

The jury unanimously concluded that Medina was exposed to asbestos released by a product manufactured or sold by BWMT's predecessor, Borg-Warner Corporation. It also unanimously concluded that this exposure to asbestos was a substantial factor in causing Medina's death. The jury further determined unanimously that Borg-Warner Corporation's products had potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of the manufacture or sale of the product, and that Borg-Warner Corporation's failure to adequately warn of those risks was a substantial factor in causing Medina's death. The jury unanimously awarded $60,000 in economic damages to Medina's estate, $130,455.70 each in economic damages to Patricia, Leticia, and Yolanda, and $2,000,000 each in noneconomic damages to Patricia, Leticia, and Yolanda. The jury unanimously allocated 35 percent of the total fault that was a substantial factor in causing Medina's

16

death to Borg-Warner Corporation. It allocated 25 percent of the fault to ASARCO, and the remaining 40 percent to General Motors.

Nine of the twelve jurors found by clear and convincing evidence "that an officer, director, or managing agent of Borg-Warner Corporation acted with malice or oppression in the conduct upon which you base your findings of liability in favor of plaintiffs." The trial therefore proceeded to a punitive damages phase.

## C. *Punitive Damages Phase of Trial*

### 1. BWMT's Financial Condition

#### a. Motion to Exclude

Prior to the second phase of trial, BWMT moved to exclude the anticipated testimony of plaintiffs' expert, forensic economist Robert Johnson. BWMT argued that Johnson's testimony should be excluded as irrelevant because it concerned the financial health of *BorgWarner, Inc.* rather than *BWMT*. BorgWarner, Inc. is "[a] different, separate corporation" from BWMT. Plaintiffs, who had not sought any discovery regarding BWMT's financial condition, conceded Johnson's two-page expert report and 14 accompanying presentation slides focused entirely on BorgWarner, Inc. and did not "breakout the separate condition of BWMT." They argued that some of the publicly available financial documents for BorgWarner, Inc. on which Johnson relied included information about BWMT. Plaintiffs represented that Johnson was prepared to testify about the financial condition of BWMT, albeit "[n]ot with that report."

The court denied BWMT's motion to exclude and permitted Johnson to testify. It limited Johnson's testimony to 30 minutes on direct, 30 minutes on cross, and 10 minutes of rebuttal.

#### b. Johnson's Testimony

Johnson testified that he was prepared to offer an expert economic opinion on the financial health and condition of BWMT. He enumerated the various corporate financial metrics he typically examines when assessing the financial health of a corporation, including its cash flow, profits, available lines of credit, net worth, cash on hand, expenditures on capital and research and development, accounting fees, market

capitalization, bond ratings, and CEO compensation. Johnson stated that he evaluated "[a]ll the factors that were available to [him] through publicly available information" for BWMT. That publicly available information consisted solely of BorgWarner, Inc.'s audited financial statements from 2009-2012 and an excerpt from an audited financial statement that documented the revenue and earnings of BWMT before interest and taxes in 2002.

Based on that information, Johnson opined, "I know that BorgWarner Morse TEC manufactures - - one of the major products they manufacture is turbo chargers, and these are the items that go into engines. And the dollar amount of the revenue for BorgWarner Morse TEC in 2002 was one billion - - . . . . [¶] If we fast forward to 2012, we know that the BorgWarner Inc. breaks out the sales of turbo chargers, which is not all that Morse Tec does. Turbo chargers has 26 percent of the engine group, which is 4.9 billion or for Morse Tec solely 1,277,000,000 in revenue." Johnson continued, "What it tells me about the financial condition is BorgWarner Morse TEC does a number of things in addition to turbo chargers. Also, there's time and change, et cetera. But what I can definitively say is that the minimum revenue for BorgWarner Morse TEC would be that almost $1.3 billion in one year." "Based on the factor that, in 2002 the earnings before interest and taxes was approximately 159 million, which makes it a little more than 15 percent, and the factor that Borg-Warner has not stated that the profitability of even the turbo chargers alone has declined over the years, particularly in 2012," Johnson ultimately opined that "the revenue of BorgWarner Morse TEC is . . . greater than $1.3 billion."

On cross-examination, Johnson conceded that his opinion was constrained by the dearth of publicly available information on BWMT and was limited to an estimation – he characterized it as an "understatement" – of BWMT's revenue. He acknowledged that revenue, or the amount of money coming into a corporation, "doesn't tell you anything about" profit or loss, cash on hand, debts for the corporation, or bank credits. Johnson further conceded that he had no information about BWMT's net worth, market capitalization, research and development, stock buybacks, accounting fees, or CEO compensation.

Johnson acknowledged that BWMT was one of "many" subsidiaries of BorgWarner, Inc. Johnson explained that "nothing in the financial documents . . . specifically broke out the profitability of BorgWarner Morse TEC." He therefore looked at the most recent profitability figures he could find, the ones from 2002, and concluded that the figures "probably stayed the same" because BorgWarner, Inc. had not told its shareholders that profitability declined.

### 2. Medina's Pain and Suffering

Plaintiffs played previously unplayed excerpts of Medina's videotaped depositions in which he described his precipitous weight loss and need for hospice care. They also called Patricia back to the stand, and she testified that Medina weighed only about 80 pounds at the time of his death. Patricia further testified that "every day he just died a little bit more and just experienced all these symptoms more and more each day." In a "fast progression," Medina became unable to eat, swallow, or speak. He eventually became completely unable to communicate and had difficulty recognizing family members he had known all his life. The only relief Patricia and other family members could provide to Medina was staying with him and holding his hand.

### 3. Motion for Nonsuit

BWMT moved for nonsuit at the close of plaintiffs' evidence. It argued that plaintiffs failed to carry their burden of proof as to BWMT's financial condition. The court denied the motion, although it noted that "the approach of the punitive damage thing should have been a lot different," such that "[t]here should have been information discovered with a protective order" or "a reasonable notice to produce somebody from Borg-Warner."

### 4. Jury Verdict

The jury unanimously awarded punitive damages of $32.5 million to Medina's estate.

### D. *Posttrial Proceedings*

BWMT filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial. The motion for JNOV focused entirely on the punitive damages

19

award, while the motion for new trial attacked all of the damage awards, punitive, economic, and noneconomic. The court denied both motions.

Eli, BWMT, and plaintiffs all filed timely notices of appeal and cross-appeal.

## DISCUSSION

### A. *Eli Canett's Appeal*

Eli brought a wrongful death claim pursuant to Code of Civil Procedure section 377.60, subdivision (c), which provides in pertinent part that a cause of action for wrongful death may be brought by a minor who is not the decedent's child or other family member "if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support." BWMT filed a motion for partial nonsuit of Eli's claim at the close of plaintiffs' case-in-chief, arguing that plaintiffs failed to demonstrate that Eli was dependent on Medina for one-half or more of his support and therefore failed to establish his standing to sue under Code of Civil Procedure section 377.60, subdivision (c). The court granted the motion.[2] Eli (by and through his mother, Aviana Canett) contends this was error because substantial evidence demonstrated that Medina provided at least half of his support.

#### 1. Standard of Review

"In reviewing a judgment of nonsuit, 'we must view the facts in the light most favorable to the plaintiff. "[C]ourts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.] [¶] In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the

---

[2]     Plaintiffs did not request the court's permission to reopen their case so they could introduce further evidence in support of Eli's standing. (See *Abreu v. Svenhard's Swedish Bakery* (1989) 208 Cal.App.3d 1446, 1457.)

20

value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor. . . . '" [Citation.] The same rule applies on appeal from the grant of a nonsuit. [Citation.]' [Citation.]" (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347.)

## 2. Analysis

The right to bring a wrongful death action is limited to those persons described in Code of Civil Procedure section 377.60. (*Phraner v. Cote Mart, Inc.* (1997) 55 Cal.App.4th 166, 168.) "'The category of persons eligible to bring wrongful death actions is strictly construed.' [Citation.]" (*Id.* at p. 169.) A plaintiff seeking to bring a wrongful death claim bears the burden of pleading and proving his or her standing to do so. (*Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 789.)

Code of Civil Procedure section 377.60 describes three groups of people who may assert a cause of action for wrongful death:

"(a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession.

"(b) Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, or parents. As used in this subdivision, 'putative spouse' means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid.

"(c) A minor, whether or not qualified under subdivision (a) or (b), if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support."

The parties agree that subdivision (c) of Code of Civil Procedure section 377.60 is the only provision that conceivably could confer standing upon Eli. They also agree that Eli resided in Medina's household for the requisite 180 days prior to Medina's death.

21

They dispute whether the evidence showed that Eli was "dependent on [Medina] for one-half or more of his support." (Code Civ. Proc., § 377.60, subd. (c).)

There is no case law applying or interpreting subdivision (c) of Code of Civil Procedure section 377.60. However, several cases have examined subdivision (b) of section 377.60 and its similar predecessor, section 377, which confer standing to bring a wrongful death claim upon a decedent's stepchildren, parents, and putative spouse and the children of that putative spouse, "if they were dependent on the decedent." (Code Civ. Proc., § 377.60, subd. (b).) Those cases establish that "dependence refers to financial support." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1445 (*Chavez*), citing *Hazelwood v. Hazelwood* (1976) 57 Cal.App.3d 693, 697-698 (*Hazelwood*), and *Perry v. Medina* (1987) 192 Cal.App.3d 603, 608 (*Perry*), abrogated on other grounds by *Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1515.) Additionally, they clarify that parents cannot be considered "dependent" for purposes of the wrongful death statute unless they were "actually dependent, to some extent, upon the decedent for the necessaries of life." (*Hazelwood*, *supra*, 57 Cal.App.3d at p. 698.) That is, "a parent cannot claim they are dependent within the meaning of Code of Civil Procedure section 377[.60] if they receive financial support from their children which merely makes . . . available to them some of the niceties of life they might not otherwise be able to afford." (*Perry*, *supra*, 192 Cal.App.3d at p. 610.) A parent may be considered "dependent" on a child for purposes of subdivision (b) only if the child provides financial support "which aids them in obtaining the things, such as shelter, clothing, food and medical treatment, which one cannot and should not do without." (*Ibid.*; see also *Chavez*, *supra*, 91 Cal.App.4th at p. 1447.)

"A 'word or phrase, or its derivatives, accorded a particular meaning in one part or portion of a law, should be accorded the same meaning in other parts or portions of the law.'" (*California Teachers Association v. Governing Board of Rialto Unified School District* (1997) 14 Cal.4th 627, 643.) We see no reason to depart from this general principle of statutory construction here, where the Legislature used the same word in subdivisions (b) and (c) of Code of Civil Procedure section 377.60. Moreover, the policy

concern animating courts' interpretation of subdivision (b) – that the "term 'dependent' would be rendered virtually meaningless if emotional dependency was sufficient to sue for wrongful death" (*Perry*, *supra*, 192 Cal.App.3d at p. 608) – is in our view equally applicable to the context of subdivision (c). We therefore conclude that the term "dependent" as used in subdivision (c) has the same meaning as the term "dependent" as used in subdivision (b).[3]

Whether there is financial dependence is a question of fact that is assessed on a case-by-case basis. (*Chavez*, *supra*, 91 Cal.App.4th at p. 1445; *Perry*, *supra*, 192 Cal.App.3d at p. 610.) The extent of any financial dependence likewise presents a question of fact. (See *Chavez*, *supra*, 91 Cal.App.4th at p. 1447-1448.) Unlike subdivision (b), which contains no minimum threshold for dependence, subdivision (c) by its plain terms requires that the minor be "dependent on the decedent for one-half or more of the minor's support." (Code Civ. Proc., § 377.60, subd. (c).) Thus, we must determine whether the evidence, when viewed in the light most favorable to Eli, was such that a reasonable jury could conclude that he relied upon Medina for one-half or more of the financial support for his necessaries of life. (See *Chavez*, *supra*, 91 Cal.App.4th at p. 1447 ["The evidence supports an inference that appellants relied on decedent's contributions for necessities . . . ."].)

We conclude that it was not. Even if we consider Eli's private pre-preschool a necessary of life, which is somewhat dubious on the facts of this case inasmuch as there was no testimony to that effect and Eli attended only three days per week, nothing in the record suggests that Eli financially *relied on* Medina for the necessaries of life. Instead, Medina's generous contributions to the Canetts' living expenses enabled all of them to enjoy "some of the niceties of life they might not otherwise be able to afford" (*Perry*,

---

[3]    We do not find persuasive plaintiffs' contention that the most analogous case law is that discussing the concept of "partial dependency" in the context of workers' compensation law. (See *Chevron U.S.A. v. Workers' Compensation Appeals Board* (1999) 19 Cal.4th 1182, 1189-1190; *Mendoza v. Workers' Compensation Appeals Board* (1976) 54 Cal.App.3d 820, 823-824.)

*supra*, 192 Cal.App.3d at p. 610), such as satellite television and the opportunity to save for a house and private school tuition. Aviana testified that the family was able to support itself prior to moving in with Medina. She and Gabriel both worked before the move and continued to do so afterward. Gabriel indicated that Medina's availability and willingness to care for Eli enabled him to work more overtime shifts than he could before, which improved the family's already self-supporting financial situation.

Although it was undisputed that Medina paid for many of the Canetts' day-to-day expenses and benevolently declined their offers to financially contribute to the household, there was no testimony that the Canetts could not afford to pay rent, buy groceries, provide clothes for Eli, or otherwise make ends meet (contra *Chavez*, *supra*, 91 Cal.App.4th at p. 1447). To the contrary, when asked how the Canetts managed their own expenses, Aviana testified that "[w]ithout my grandfather's help, without him accepting our rent, or trying to accept our rent and stuff, I don't believe we would have been able to save up for our house or even be able to continue Eli's private school education. We've been able to save up and continue to put him in a private school, so that it is a better school for him and to provide a bigger home for our growing family." In other words, as Eli concedes in his brief, "his parents *could have* supported him at some other, lower, standard of living without Mr. Medina's help," but Medina "chose to provide Eli with a more comfortable existence." Medina's largesse toward Eli and his parents was laudable and improved their station in life, but it did not render Eli financially dependent upon him.[4]

We accordingly affirm the trial court's grant of nonsuit on the record before us.

## B.     *BWMT's Cross-Appeal*

In its cross-appeal, BWMT challenges the punitive damages awarded to Medina's estate and the noneconomic damages awarded to his three daughters.

---

[4]     We do not intend by this ruling to diminish the significance of the role Medina played in Eli's life and upbringing while Eli resided in his household.

24

### 1. Punitive Damages

BWMT contends that the $32.5 million punitive damages award to Medina's estate cannot stand because it is unsupported by the evidentiary record. We agree with BWMT that the record lacks meaningful evidence of BWMT's financial condition and ability to pay a punitive damages award. We accordingly conclude that the award must be reversed on that basis. We need not and do not reach BWMT's alternative arguments concerning the state of the evidentiary record or its due process rights.

### a. Governing Principles

Civil Code section 3294, subdivision (a) permits an award of exemplary or punitive damages "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." The purposes of punitive damages are to punish the defendant for the conduct that harmed the plaintiff and deter the commission of future wrongful acts. (Civil Code § 3294, subd. (a); *Neal v. Farmers Insurance Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 (*Neal*).) "'It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective[s]. [Citations.]' [Citation.]" (*Neal*, *supra*, 21 Cal.3d at p. 929.) "[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." (*Id.* at p. 928.) At the same time, however, the purpose of punitive damages is equally unserved if a defendant is financially destroyed by an award. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 112 (*Adams*).) "The ultimately proper level of punitive damages is an amount not so low that defendant can absorb it with little or no discomfort [citation], nor so high that it destroys, annihilates, or cripples the defendant. [Citations.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 621-622.)

In order for the jury (and the reviewing court) to ascertain whether a punitive damages award is properly calibrated so as to inflict economic pain without financially ruining the defendant, it needs some evidence about the defendant's financial condition and ability to pay the award. (*Adams*, *supra*, 54 Cal.3d at pp. 111, 117.) Thus, our

25

Supreme Court held in *Adams* "that an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Id.* at p. 109; see also *id.* at p. 119.) It is the plaintiff's obligation to ensure that this requirement is satisfied (*id.* at pp. 119, 123); "[i]t is not too much to ask of a plaintiff seeking such a windfall to require that he or she introduce evidence that will allow a jury and a reviewing court to determine whether the amount of the award is appropriate and, in particular, whether it is excessive in light of the central goal of deterrence" (*id.* at p. 120).

A defendant's records may be the only source of information regarding its financial condition. (See *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 609 (*Mike Davidov Co.*).) Although Civil Code section 3295, subdivision (c), seeks to safeguard the privacy of those records (*Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 120) by prohibiting the plaintiff from seeking pretrial discovery of a defendant's financial condition or profits "unless the court enters an order permitting such discovery pursuant to this subdivision" (Civ. Code, § 3295, subd. (c)), plaintiffs have several discovery tools at their disposal. To obtain the order described in Civil Code section 3295, the plaintiff must follow the procedure set forth in the statute: "Upon motion by the plaintiff supported by appropriate affidavits and after a hearing, if the court deems a hearing to be necessary, the court may at any time enter an order permitting the discovery otherwise prohibited by this subdivision if the court finds, on the basis of the supporting and opposing affidavits presented, that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 ["Exemplary damages; when allowable; definitions"]." (Civ. Code, § 3295, subd. (c).) The plaintiff may make the motion any time during the proceedings, and the court may issue its order at any time, including after a finding of liability has been made. (*Mike Davidov Co.*, *supra*, 78 Cal.App.4th at p. 609.)

Civil Code section 3295, subdivision (c) also enables a plaintiff seeking punitive damages to use subpoenas to require defendant to produce financial information at trial. A plaintiff "may subpoena documents or witnesses to be available at trial for the purpose

26

of establishing the profits or financial condition . . . and the defendant may be required to identify documents in the defendant's possession which are relevant and admissible for that purpose and the witnesses employed by or related to the defendant who would be most competent to testify to those facts." (Civ. Code, § 3295, subd. (c); see also Code Civ. Proc. § 1987 [subpoena procedures]; *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1303 (*Pfeifer*) [noting that requests to produce information were made pursuant to Code Civ. Proc. § 1987].) The traditional subpoena process protects the defendant's privacy interests while affording the plaintiff some assurance that the defendant's financial information will be at the ready if and when it becomes necessary. Moreover, the traditional subpoena process allows the plaintiff to identify key documents and witnesses and prepare its strategy accordingly.

There are two alternative discovery methods available to a plaintiff that is disinclined or unable to avail itself of the procedures set forth in Civil Code section 3295, subdivision (c). First, the plaintiff may request that the defendant "stipulate to a process by which [the defendant] would gather documents pertaining to [its] financial condition, bring them to trial under seal and make them immediately available" in the event that the jury's findings make punitive damages available. (*Jabro v. Superior Court* (2002) 95 Cal.App.4th 754, 756.) This procedure "is a frequently used and effective means of handling the matter when a claim for punitive damages is alleged," and may be suggested or facilitated by the court. (*Ibid.*) Finally, a plaintiff may do nothing pretrial and instead wait until liability is established to ask the court for the order described in Civil Code section 3295, subdivision (c). (*Mike Davidov Co.*, *supra*, 78 Cal.App.4th at p. 609.) This strategy may backfire, however, as it is left to the court's discretion whether to delay the proceedings by ordering the defendant to produce information that could have been obtained earlier or to forge ahead upon concluding that such an order is inappropriate under the circumstances of the case. (*I-CA Enterprises, Inc. v. Palram Americas, Inc.* (2015) 235 Cal.App.4th 257, 284 (*I-CA*).)

It is the province of the trial court to ensure that both parties comply with the letter and spirit of these discovery provisions. (See *Mike Davidov Co.*, *supra*, 78 Cal.App.4th

27

at p. 609; *I-CA*, *supra*, 235 Cal.App.4th at pp. 283-284.) "[I]t may not be a defendant's burden to prove its net worth, but if it is ordered to produce that evidence it is under an obligation to do so." (*StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 243.) The consequences for a disobedient or reluctant defendant can be dire. On at least two occasions, the court of appeal has upheld awards of punitive damages where the dearth of evidence of the defendant's financial condition is attributable to defendant's failure to comply with discovery obligations or orders. (*Mike Davidov Co.*, *supra*, 78 Cal.App.4th at pp. 609-610; *Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 453-454.) Likewise, a plaintiff's "lack of diligence and preparation in failing to raise this discovery issue until the eve of the punitive damages phase of trial" may fatally undermine an otherwise valid claim for punitive damages. (*I-CA*, *supra*, 235 Cal.App.4th at pp. 282, 284; see also *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919-920 (*Kelly*).)

Our Supreme Court has not prescribed a rigid standard for measuring a defendant's ability to pay. (*Pfeifer, supra*, 220 Cal.App.4th at p. 1308, citing *Adams*, *supra*, 54 Cal.3d at p.116, fn. 7.) Accordingly, there is no one particular type of financial evidence a plaintiff must obtain or introduce to satisfy its burden of demonstrating the defendant's financial condition. Evidence of the defendant's net worth is the most commonly used, but that metric is too susceptible to manipulation to be the sole standard for measuring a defendant's ability to pay. (*Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582; *Pfeifer*, *supra*, 220 Cal.App.4th at p. 1308; *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 79-80; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065 & fn. 3.) Yet the "net" concept of the net worth metric remains critical. "In most cases, evidence of earnings or profit alone are not sufficient 'without examining the liabilities side of the balance sheet.' [Citations.]" (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680 (*Baxter*); see also *Pfeifer*, *supra*, 220 Cal.App.4th at p. 1308; *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152.) Evidence of a defendant's income, standing alone, is not "meaningful evidence." (*Mike Davidov Co.*, *supra*, 78 Cal.App.4th at p. 607.)

28

"Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Baxter*, *supra*, 150 Cal.App.4th at p. 680.) "'Without evidence of the actual total financial status of the defendants, it is impossible to say that any specific award of punitive damage is appropriate.' [Citation.]" (*Kelly*, *supra*, 145 Cal.App.4th at p. 915.) "Thus, there should be some evidence of the defendant's actual wealth" (*Baxter*, *supra*, 150 Cal.App.4th at p. 680), but the precise character of that evidence may vary with the facts of each case (see *Rufo v. Simpson*, *supra*, 86 Cal.App.4th at pp. 624-625; *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 391). The evidence should reflect the named defendant's financial condition at the time of trial. (*Kelly*, *supra*, 145 Cal.App.4th at p. 915 [financial condition at time of trial]; *Tomaselli v. Transamerica Insurance Co.* (1994) 25 Cal.App.4th 1269, 1283 [named defendant].)

Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages. (See *Mike Davidov*, *supra*, 78 Cal.App.4th at p. 607.) We examine the record to determine whether the challenged award rests upon substantial evidence. (See *Baxter*, *supra*, 150 Cal.App.4th at p. 681; *Pfeifer*, *supra*, 220 Cal.App.4th at pp. 1309-1310.) If it does not, and if plaintiffs had a full and fair opportunity to make the requisite showing, the proper remedy is to reverse the award. (*Kelly*, *supra*, 145 Cal.App.4th at pp. 919-920.)

### b. Analysis

BWMT contends that the record does not contain adequate evidence of its financial condition to support an award of punitive damages. We agree.

As discussed above, the only evidence of BWMT's financial condition was the somewhat muddled testimony of plaintiffs' expert, Robert Johnson. Johnson analyzed the publicly available financial statements of BWMT's parent company, BorgWarner, Inc., and used extrapolation to estimate that BWMT's revenue was greater than $1.3 billion. Johnson's use of data regarding BorgWarner, Inc. rather than data directly pertaining to BWMT, while perhaps not ideal, was not in and of itself problematic, as BWMT contends. Unlike the plaintiff in *Tomaselli v. Transamerica Insurance Co.*, *supra*, 25

29

Cal.App.4th at p.1283, who introduced evidence pertaining *only* to defendant's corporate parent, Johnson testified about BWMT specifically. Johnson's testimony about BWMT's revenue stream associated with turbo chargers constituted some evidence of BWMT's financial condition.

The problem is that this evidence was, at best, pertinent to only half of BWMT's balance sheet and therefore was not, standing alone, meaningful evidence of BWMT's financial condition. (*Mike Davidov Co.*, *supra*, 78 Cal.App.4th at p. 607.) Johnson's testimony did not shed any light on BWMT's liabilities or expenses, with respect to either the turbo charger line or BWMT's business as a whole. Indeed, Johnson acknowledged on cross-examination that revenue "doesn't tell you anything about" profits, losses, debts, or available credit. In other words, revenue alone provides little information about a defendant's ability to pay punitive damages. This case is analogous to *Baxter*, in which the plaintiff submitted evidence demonstrating defendant's employment and ownership of several pieces of real estate but failed to offer any evidence of the extent to which the properties may have been encumbered, whether they were profitable, or whether the defendant's income exceeded her indebtedness. (*Baxter*, *supra*, 150 Cal.App.4th at p. 681.) The *Baxter* court observed that "although the record shows that [the defendant] owns substantial assets, it is silent with respect to her liabilities." (*Ibid.*) The same is true here. The record shows that BWMT earned substantial revenues from one of its business lines, but is silent in all other respects. Thus, as in *Baxter*, "[t]he record is thus insufficient for a reviewing court to evaluate [the defendant's] ability to pay . . . punitive damages." (*Ibid*; see also *Kelly*, *supra*, 145 Cal.App.4th at p. 917 ["without any evidence he still held the assets, or the amount of his liabilities, the . . . award is unsupported by substantial evidence and excessive"].)

Plaintiffs contend that Johnson's testimony establishing "the historical net revenue" associated with BWMT's turbo charger line in 2002 – the 15 percent figure – and opining that nothing in BorgWarner, Inc.'s reports suggested that number had changed, shifted the burden of producing contrary evidence to BWMT. We disagree. Even construed in the light most favorable to plaintiffs, Johnson's testimony at most

30

demonstrated that some portion of BWMT's business turned a profit. It did not provide any of the requisite current information about BWMT's overall financial condition outside the turbo charger line. (See *Kelly supra*, 145 Cal.App.4th at p. 915.) This partial showing does not in our view shift the burden of producing evidence regarding BWMT's ability to pay to BWMT. In *Pfeifer*, we found expert testimony identifying the defendant's total assets and total liabilities, characterizing asbestos litigation funds as a liability, and describing the function of those litigation funds to be "sufficient to shift the burden of producing evidence regarding [defendant's] ability to pay to [defendant]." (*Pfeifer*, *supra*, 220 Cal.App.4th at. p. 1310.) The evidence here fell far short of that introduced by the plaintiffs in *Pfeifer* and accordingly did not shift any burden to BWMT.

Plaintiffs also suggest that the evidentiary shortfall was precipitated by BWMT. The record reflects otherwise.

In response to BWMT's oral request to exclude Johnson's expert testimony on the ground he analyzed the wrong company (BorgWarner, Inc. instead of BWMT), plaintiffs argued that BWMT and BorgWarner were one and the same and, moreover, "they don't get to avoid punitive damages and net worth because if that were the case, then they need to be standing here right now with a packet to hand me and my economist under 3295 as to what their particular financial information is for purposes of making that financial evaluation." The court asked plaintiffs if they had sent "any discovery or request[ed] anybody to appear from defendant Borg-Warner Corporation." Plaintiffs said they had not because "[w]e're not allowed to do that until there's a finding of punitive damages under 3295." The court then asked if plaintiffs were *prepared* to make discovery requests now that the jury was deliberating the liability issues, and plaintiffs said, "[w]e have not been prepared to do that because our view is that Borg-Warner Corporation is the proper entity and the financials of this and every other Borg-Warner entity is embedded in that public company."

The court suggested that plaintiffs could give BWMT a notice to appear, which prompted BWMT to object that such notice would be untimely on the eve of the punitive damages trial. Plaintiffs stood silent as BWMT and the court reviewed the notice

31

requirements set forth in Code of Civil Procedure section 1987 and discussed "the traditional way" parties obtain financial data, namely by making a formal request prior to trial. They remained silent when the court mentioned and immediately rejected the possibility of a continuance.

The next morning, plaintiffs brought Johnson to court to testify, and the court allowed him to take the stand after plaintiffs represented that he was prepared to testify to the financial condition of BWMT. At the close of his testimony, plaintiffs indicated that they had issued notices to appear and called to the stand "whoever BorgWarner Morse TEC has brought to court to discuss this matter." BWMT objected that the notices were untimely and ineffective because they had been issued the night before to a corporation and an individual located in Michigan. The court sustained the objection "[o]n the grounds that it's untimely and it's unreasonable notice." Later, the court commented, "I believe that the approach of the punitive damage thing should have been a lot different. There should have been information discovered with a protective order. There should have been . . . a reasonable notice to produce somebody from Borg-Warner, the defendant Borg-Warner. It wasn't done."

We agree with the trial court's assessment. Although we recognized in *Pfeifer* that "the trial court was authorized to order discovery" at the close of the liability phase, (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1306), the conclusion that a trial court had the authority to order discovery at the eleventh hour "does not preclude a trial court from determining, in its discretion, that such an order is inappropriate" (*I-CA*, *supra*, 235 Cal.App.4th at p. 284). Here, plaintiffs erroneously believed the financial information they obtained through publicly available channels would be sufficient until BWMT pointed out, on the eve of the punitive damages phase, that their expert had analyzed the wrong company. The court was not obligated to accommodate plaintiffs' last-minute attempt to obtain the correct information through traditional discovery channels. There was no indication that BWMT in any way hampered or even opposed plaintiffs' efforts to obtain the information in a more timely fashion. To the contrary, the record reflects that plaintiffs did not undertake any effort to obtain the information at an earlier juncture,

32

whether by issuing a subpoena, seeking a stipulation, or a making a motion pursuant to Civil Code section 3295, subdivision (c). (See *Kelly*, *supra*, 145 Cal.App.4th at pp. 919-920.) Instead, they assumed BWMT would simply come forward with the information, unprompted. "Whatever merit there might be to that approach in other cases, it was an unfortunate choice in this one." (*Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London, England* (1995) 34 Cal.App.4th 554, 562.) By all indications, plaintiffs had a full and fair opportunity to engage in discovery but elected to take the wait-and-see approach. They must bear the consequences of the resultant evidentiary shortfall. (See *Baxter*, *supra*, 150 Cal.App.4th at p. 681; *Kelly*, *supra*, 145 Cal.App.4th at p. 920; contra *Mike Davidov Co.*, *supra*, 78 Cal.App.4th at pp. 609-610; *Green v. Laibco, LLC*, *supra*, 192 Cal.App.4th at pp. 453-454.)

On the record as it stands, we must conclude that there was insufficient evidence of BWMT's financial condition to enable the jury to make an intelligent assessment of BWMT's ability to pay a punitive damages award. Accordingly, we reverse the award of punitive damages. No retrial is required. (*Baxter*, *supra*, 150 Cal.App.4th at p. 681; *Kelly*, *supra*, 145 Cal.App.4th at pp. 919-920.)

### 2.     Noneconomic Damages

BWMT contends that the jury's awards of $2 million in noneconomic damages to each of Yolanda, Leticia, and Patricia was excessive. It argues that the awards were the product of improperly admitted evidence of Medina's pain and suffering, as well as the charged arguments plaintiffs' counsel made in closing. We reject these contentions and affirm the awards.

#### a.     Governing Principles

In a wrongful death action, the jury may award such damages as may be just under all the circumstances of the case. (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 720 (*Mendoza*); Code of Civ. Proc., § 377.61.) Noneconomic damages are intended to provide "the monetary equivalent of loss of comfort, society, and protection." (*Mendoza*, *supra*, 206 Cal.App.4th at p. 720.) "The pecuniary value of the society, comfort, and protection that is lost through the wrongful death of a spouse,

33

parent, or child may be considerable in cases where, for instance, the decedent had demonstrated a 'kindly demeanor' toward the statutory beneficiary and rendered assistance or 'kindly offices' to that person. [Citation.]" (*Corder v. Corder* (2007) 41 Cal.4th 644, 661-662.) Plaintiffs in a wrongful death action may not recover for "the grief or sorrow attendant upon the death of a loved one." (*Ibid.*)

"We have very narrow appellate review of the jury's determination of the amount of compensation for [plaintiffs'] loss of comfort and society." (*Rufo v. Simpson*, *supra*, 86 Cal.App.4th at p. 614.) "The jury 'is entrusted with vast discretion in determining the amount of damages to be awarded,' and a reviewing court will reverse or reduce the award only ""where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice. . . ."' [Citations.]' [Citation.]" (*Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 985.) We typically defer to the jury's discretion "in the absence of some other factor in the record, such as inflammatory evidence, misleading instructions or improper argument by counsel, that would suggest the jury relied upon improper considerations." (*Rufo v. Simpson*, *supra*, 86 Cal.App.4th at p. 615.) "'It must be remembered that the jury fixed these damages, and that the trial judge denied a motion for new trial . . . . These determinations are entitled to great weight . . . . [A]ll presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice, or corruption on the part of the jury.'" (*Bender v. County of Los Angeles*, *supra*, 217 Cal.App.4th at p. 986, quoting *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507; see also *Rufo v. Simpson*, *supra*, 86 Cal.App.4th at p. 614.)

Our review of the court's rulings concerning the admissibility of evidence and BWMT's motion for new trial are similarly deferential. ""Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion."' [Citation.]" (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332.)

34

"The court's "'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered."' [Citation.]" (*Ibid.*) Even if the trial court abused its discretion in admitting evidence, any error requires reversal only if BWMT can demonstrate a reasonable probability that a more favorable result would have been reached absent the error. (Code Civ. Proc., § 475; see also Cal. Const., art. VI, § 13.) We will not disturb the trial court's ruling on a motion for new trial unless the record reveals a manifest and unmistakable abuse of discretion. (*Fredrics v. Paige* (1994) 29 Cal.App.4th 1642, 1647; see also *Rufo v. Simpson*, *supra*, 86 Cal.App.4th at p. 614.)

### b. Analysis

BWMT contends that the trial court repeatedly erred by allowing plaintiffs to present evidence of Medina's pain and suffering during the liability phase of trial. (Much of the challenged evidence is outlined above under the heading "Medina's Diagnosis and Decline.") Even if we assume BWMT is correct on this point, we are not persuaded that the result would have been any more favorable to BWMT had the challenged evidence been excluded. The court expressly instructed the jury not to consider "plaintiffs' grief, sorrow, or mental anguish," or Medina's "pain and suffering" when calculating plaintiffs' noneconomic losses, and plaintiffs' counsel echoed this sentiment in her closing argument. Absent some contrary indication in the record, which is not present here, "we presume the jury follows its instructions . . . . 'and that its verdict reflects the legal limitations those instructions imposed' [citation]." (*Cassim v. Allstate Insurance Co.* (2004) 33 Cal.4th 780, 803-804; see also *Saari v. Jongordon Corp.* (1992) 5 Cal.App.4th 797, 808.)

BWMT suggests that plaintiffs' closing argument improperly inflamed the passions of the jury. BWMT contends that plaintiffs "seized" upon evidence of Medina's pain and suffering "to urge the jury to convert Mr. Medina's pain and suffering into a 'big pile of money.'" Although it now repeatedly asserts that this and other similar arguments were improper, BWMT did not object to any of them during trial. "Generally, an appellant forfeits the right to attack error by expressly or impliedly agreeing at trial to

35

the procedure objected to on appeal." (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1309.) By remaining silent during plaintiffs' counsel's zealous closing argument, BWMT forfeited any right to challenge the remarks as improper or inflammatory at this juncture.

BWMT's final contention is that the noneconomic damages awards are grossly excessive when compared to those awarded in factually similar cases. Although we may consider amounts awarded in similar cases, "in the final analysis the question in each case must be determined from its own peculiar facts and circumstances." (*Daggett v. Atchison, Topeka & Santa Fe Railway Company* (1957) 48 Cal.2d 655, 666.) "There is no fixed standard by which we can determine that an award is excessive." (*Mendoza*, *supra*, 206 Cal.App.4th at p. 720.) "'[T]o state that the damages awarded by the jury are excessive is simply one way of saying that the evidence does not justify the amount of the award.' [Citation.]" (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1055.) We cannot say that here.

Factors such as the closeness of a family unit, the depth of their love and affection, and the character of the decedent as kind, attentive, and loving are proper considerations for a jury assessing noneconomic damages (*Mendoza*, *supra*, 206 Cal.App.4th at p. 721), and evidence of those factors was abundant in this case. The record reflects that Medina was an exceptionally generous, kind, and compassionate man who cared deeply for his family. Each of his daughters – the recipients of the challenged awards – provided compelling testimony about her close bond with Medina and the profound effect that his death had on her. Patricia testified that Medina helped her "find [her] way as an adult," gave her advice, and provided her with wisdom and comfort during difficult times in her life. Leticia testified that Medina was "the glue that held everybody together" and provided her and the rest of the family with encouragement, advice, and support. Yolanda, who described Medina as her best friend and confidant, testified that he always made the family smile and laugh and provided her with guidance and support. This evidence amply supports the jury's awards. As noted above, noneconomic damages "may be considerable in cases where . . . the decedent had demonstrated a 'kindly demeanor' toward the statutory beneficiary and rendered assistance or 'kindly offices' to

36

that person." (*Corder v. Corder*, *supra*, 41 Cal.4th at pp. 661-662.)  This case exemplifies this principle.

The wrongful death cases BWMT cites in support of its claim the awards for noneconomic damages are excessive, including *Collins v. Plant Insulation Co.* (2010) 185 Cal.App.4th 260, 265, and *Ehret v. Congoleum Corp.* (2001) 87 Cal.App.4th 202, 204, provide no information about the facts that underlay their smaller damages awards. They therefore furnish no basis for useful comparison.  One of plaintiffs' cases, *Mendoza*, *supra*, 206 Cal.App.4th at pp. 720-721, however, suggests that the evidence in the instant case justifies the awards.  In *Mendoza*, a jury awarded $750,000 in noneconomic damages to each of the adult sons of a decedent who died while in police custody. (*Mendoza*, *supra*, 206 Cal.App.4th at p. 706.)  The appeals court concluded the awards were not excessive because the record demonstrated that the sons had a loving and caring relationship with their father, even though they lived in a different country and received emotional support from him only via telephone.  (See *Mendoza*, 206 Cal.App.4th at p. 721.)  The record here depicts substantially closer and stronger relationships between plaintiffs and Medina, relationships that likely would have continued throughout his statistical life expectancy of approximately eight more years.  In our view, the record fully supports the noneconomic damages awards.

## C.     *Plaintiffs' Cross-Appeal*

In their cross-appeal, plaintiffs contend that the jury's decision to allocate 25 percent of the fault for Medina's mesothelioma to ASARCO was not supported by substantial evidence.  They argue that there was no substantial evidence to support a finding that Medina was actually exposed to asbestos as a result of his or his father's work at ASARCO, and that even if there was, there was no evidence – or a specific finding – that ASARCO was negligent in exposing its employees to asbestos or that any such negligence contributed to Medina's illness.  We reject these contentions and affirm the jury's apportionment of liability.

37

### 1. Governing Principles

In an action for wrongful death, each defendant's liability for a plaintiff's noneconomic damages is several only, and each defendant is liable only for the percentage of noneconomic damages that corresponds to its proportionate share of fault. (Civil Code, § 1431.2, subd. (a).) A defendant accordingly may reduce its own comparative fault by pointing the finger at other tortfeasors, including those who are not party to the case. (See *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 603.) "The comparative fault doctrine 'is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine "is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an 'equitable apportionment of loss.'"' [Citation.]" (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1285.) The defendant bears the burden of establishing that some nonzero percentage of fault is properly attributable to other entities. (*Ibid.*) A defendant seeking apportionment of fault in an asbestos case accordingly must demonstrate that the asbestos from a particular product or source "'was a substantial factor contributing to the . . . [plaintiff's] *risk* of developing cancer.' [Citation.]" (*Id.* at p. 1287; see also *id.* at p. 1288.)

We review the jury's allocation of fault for substantial evidence. (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1286.) That means that we "'consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment. [Citation.]' [Citation.]" (*Ibid.*) We may not substitute our own judgment for that of the jury or set aside the jury's findings if the record contains any evidence which under any reasonable view supports the jury's apportionment. (*Ibid.*) Additionally, as always, "we start with the presumption that the record contains evidence sufficient to support the judgment. It is the appellant's affirmative burden to demonstrate otherwise." (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 33.) Under these standards, "courts rarely disturb the jury's apportionment of fault." (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1285.)

## 2. Analysis

Plaintiffs' first contention is that BWMT failed to provide the jury with any evidence that Medina was exposed to asbestos as a result of his or his father's work at ASARCO. Exposure to the relevant asbestos product is a threshold issue in asbestos litigation. (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1236 (*Casey*); *Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1084.) "'If there has been no exposure, there is no causation'" (*Casey*, *supra*, 206 Cal.App.4th at p. 1236), and the claim fails. "Mere speculation or conjecture about exposure to asbestos" is not sufficient. (*Id.* at p. 1237.) There must be some evidence that exposure actually occurred. Thus, the testimony from numerous experts that Medina *could* have been exposed to asbestos at ASARCO is not sufficient to demonstrate exposure. Nor are Medina's responses to contention interrogatories that BWMT read into the record. As BWMT acknowledged through its use of the terms "claims" and "believed," these responses were "little more than general allegations against [ASARCO] and d[id] not state specific facts showing that [Medina] was actually exposed to asbestos-containing material" at ASARCO. (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 104; see also *Casey*, *supra*, 206 Cal.App.4th at p. 1230.)

There is other evidence, however, that supports the jury's implicit finding that it is more likely than not that Medina was exposed to asbestos at ASARCO. Medina testified that he was exposed to dust at ASARCO when his coworkers removed and replaced pipe-covering insulation in the furnace and boiler houses. Dr. Longo opined that ASARCO likely had thermal insulation in place in the 1940's and 1950's, and further testified that he had personally been to the plant and knew that asbestos was present there. Dr. Castleman characterized pipe coverings as "thermal insulating products," and further testified that a majority of the thermal insulating products used in the United States during the time Medina worked at ASARCO contained asbestos. Dr. Hessel opined that people who are exposed to thermal insulation face an increased risk of contracting mesothelioma; he did not expressly restrict his opinion to asbestos-containing insulation. Dr. Horn opined that cleaning up thermal insulation removed from pipes would

39

contribute to the risk of mesothelioma if the insulation contained asbestos. The jury reasonably could have pieced together this testimony to infer that it was more likely than not that Medina was exposed to asbestos at ASARCO.

Plaintiffs argue that *Dumin v. Owens-Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650 (*Dumin*) compels the opposite conclusion. We disagree. In *Dumin*, the plaintiff alleged that he was exposed to asbestos-containing insulation manufactured and/or distributed by the defendant while he worked on two different Navy ships. (*Dumin*, *supra*, 28 Cal.App.4th at p. 653.) To prove his exposure, the plaintiff relied on deposition testimony from a different case in which the witness listed some of the insulation materials used at a naval shipyard and testified that he may have seen the insulation in question "somewhere around the '50s," and testimony from an engineer who said it was "'[q]uite probable'" that supplies on the Navy ships would be the same as those used at the shipyard. (*Id.* at pp. 653-654.) The trial court granted defendant's motion for nonsuit, and the court of appeal affirmed. The court of appeal concluded that, when viewed in the best light, the evidence established only that plaintiff was aboard a Navy ship in 1953 and 1954, that his duties included making repairs using insulation materials, that the ship was home ported at a particular shipyard at which defendant's asbestos-containing product was one of many used, and that the ship's repair supplies probably came from the shipyard. The court determined that on this evidence, "a conclusion that Dumin was exposed to [defendant's product] while aboard [the Navy ship] in 1953 and 1954 would require a stream of conjecture and surmise." (*Id.* at p. 656.)

The evidence linking Medina to *any* asbestos-containing material at ASARCO is appreciably less tenuous. Medina's testimony placed him at the ASARCO plant, breathing dust from thermal insulation. The experts, one of whom had been to the ASARCO plant, collectively testified (1) ASARCO likely had thermal insulation in place in the 1940's and 1950's, (2) a majority of the thermal insulating products used in the United States during that time contained asbestos, (3) individuals exposed to thermal insulation face an increased risk of mesothelioma, and (4) this is particularly true where

40

the insulation contained asbestos. This evidentiary chain is perhaps not robust, but, when viewed in the light most favorable to the jury's finding, it is adequate to support that finding. We further note that it appears plaintiffs reached the same conclusion during trial, as they included ASARCO in their proposed jury instruction on allocation despite raising objections to BWMT's attempts to include additional entities.

Plaintiffs next contend that the allocation of liability to ASARCO cannot stand because BWMT failed to provide substantial evidence that ASARCO was "at fault" or otherwise liable for Medina's injury. We disagree. To support an allocation of liability to another party in an asbestos case, a defendant must "present evidence that the aggregate dose of asbestos particles arising from" exposure to that party's asbestos "constituted a substantial factor in the causation of [the decedent's] cancer." (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1288-1289.) As we have discussed, substantial evidence supported the jury's conclusion that Medina was exposed to asbestos at ASARCO. And, unlike in *Pfeifer*, where "no expert opined that [the plaintiff's allegedly negligent conduct] was, by itself, a substantial factor in the causation of his cancer" (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1288), Dr. Horn expressly opined that all of Medina's lifetime exposures to asbestos, "each of them in and of themselves," were a substantial factor in causing Medina's mesothelioma. This evidence from plaintiffs' expert is substantial and supports the jury's allocation of liability to ASARCO.

Finally, plaintiffs assert that the trial court's refusal to include on the special verdict form their requested questions pertaining to ASARCO's liability "was error and undoubtedly contributed to the jury's confusion in allocating fault in the absence of proof." Essentially, they contend that the special verdict form was defective because it did not require the jury to make explicit findings that Medina was exposed to asbestos at ASARCO and that such exposure was a substantial factor in causing his mesothelioma. As they explained to the trial court, they believe "it should be the same questions for those entities because [BWMT has] the same burden of proof, and the jury needs to make the same findings." We find no prejudicial error.

41

We presume that the jury followed the court's instructions regarding ASARCO's potential liability, which plaintiffs have not challenged. (*Cassim v. Allstate Insurance Co.*, *supra*, 33 Cal.4th at pp. 803-804.) The court instructed the jury that parties not named as defendants may nevertheless bear some responsibility for Medina's injury and that BWMT claimed ASARCO and General Motors contributed to Medina's harm. The court further instructed the jury that BWMT had to prove that ASARCO was "negligent or at fault," and that ASARCO's negligence or fault "was a substantial factor in causing Mr. Medina's harm" before the jury could decide how much responsibility to assign to each party listed on the verdict form.

The question the court included on the special verdict form fully incorporated these concepts into a succinct query: "If 100% represents the total fault that was a substantial factor in causing Secundino Medina's death, what percentage of this 100% was due to the fault of Borg-Warner Corporation or others listed below who you have determined was a substantial factor? (The total fault allocations below must add up to 100%.)" The question by its terms required the jury to find both fault and causation before apportioning liability. There was substantial evidence in the record enabling the jury to make these findings, and we have no reason to conclude that the jury did not understand the special verdict form.

In their reply brief, plaintiffs rely heavily on *Vollaro v. Lispi* (2014) 224 Cal.App.4th 93 *(Vollaro)* to support their contention that the special verdict form in this case was defective. We do not find their analogy to *Vollaro* persuasive.

In *Vollaro*, the defendant in a personal injury action arising from an automobile accident sought to apportion liability to a nonparty, the driver of the car she rear-ended. The trial court denied her request for special verdict findings as to that driver's negligence, causation, and the percentage of fault attributable to each driver on the ground that her testimony about the behavior of the other driver did not constitute substantial evidence of that driver's negligence. (*Vollaro*, *supra*, 224 Cal.App.4th at pp. 97, 100.) We disagreed and reversed. We concluded that the defendant's testimony about the other driver's sudden stop was enough to permit the jury to find that the other

42

driver violated the minimum speed law, which would give rise to a presumption of negligence. (*Id.* at p. 102.) We further concluded that the jury's special verdict findings were incomplete because the jury was not asked to resolve the disputed issues of the other driver's negligence, causation, and proportionate fault, and that the defendant was prejudiced by the error because the jury failed to resolve all of the factual issues presented. (*Id.* at pp. 103-104.) The instant case is materially different. The trial court properly allowed the issue of apportionment to proceed to the jury (again, without objection from plaintiffs) and the jury resolved all of the disputed issues with which it was presented. We do not read *Vollaro* to require that each disputed issue be presented in an individual question; rather, it holds that a jury rendering a special verdict must resolve all disputed issues presented by the evidence. The jury here fulfilled that duty. Moreover, plaintiffs have not shown how they were prejudiced by the allocation question, which is in line with others used in similar cases. (See *Stewart v. Union Carbide Corp., supra*, 190 Cal.App.4th at p. 31.)

## DISPOSITION

The award of punitive damages is reversed. The remainder of the judgment is affirmed. The parties are to bear their own costs on appeal.

COLLINS, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

43

Filed 8/5/15

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PATRICIA SOTO et al., | B252995 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC432930 and JCCP 4674) |
| v. | |
| BORGWARNER MORSE TEC INC., | ORDER CERTIFYING OPINION FOR PUBLICATION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on July 15, 2015, was not certified for publication in the Official Reports.  Good cause appearing, it is ordered that the opinion in the above-entitled matter be published in the official reports.

The petition for rehearing is denied.

_____

MANELLA, J.                                              COLLINS, J.