Filed 6/30/22  P. v. Soriano CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>OSCAR SORIANO,<br><br>     Defendant and Appellant. | A161929<br><br>(San Francisco City &<br>County Super. Ct. Nos.<br>SCN222511, CT13023221) |

Early on the morning of August 17, 2013, defendant Oscar Soriano crashed into a Mack truck that was parked on the side of a street in San Francisco.  Passenger Rachel E. was severely injured as a result of the accident, permanently losing use of her left arm.  A second passenger, Daniel P., suffered less significant injuries.

On July 22, 2016, over the prosecutor's objection, defendant entered an open guilty plea to one felony count of driving under the influence causing injury, in violation of Vehicle Code section 23153, subdivision (a), and one felony count of driving with a blood alcohol content (BAC) of .08 percent or greater causing injury, in violation of Vehicle Code section 23153, subdivision (b). As to both counts, he further admitted that he had personally

1

inflicted great bodily injury on a victim, in violation of Penal Code[1] section 12022.7, subdivision (a), and caused bodily injury to more than one victim, in violation of Vehicle Code section 23558.

At the initial sentencing hearing in August 2016, the court ordered imposition of sentence suspended and placed defendant on five years' probation, ordering that defendant pay restitution but reserving jurisdiction to determine the amount. After numerous continuances, extensive briefing, and multiple restitution hearings , on January 13, 2021, the trial court ordered defendant to pay Rachel E. $1,615,972.99 in lost wages pursuant to section 1202.4(f), representing the loss of 25 years of full-time employment, plus an additional 20 years of half-time employment, all at minimum wage.[2]

On appeal, defendant contends that the trial court abused its discretion in two ways: first, by failing to apply the doctrine of comparative negligence when determining the restitution amount; and second, by ordering a restitution amount that lacked a rational basis. Finding no prejudicial error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution, Plea, and Sentence*

Defendant was charged with and pled open to one felony count of driving under the influence causing injury, in violation of Vehicle Code section 23153, subdivision (a), and one felony count

---

[1] Subsequent undesignated statutory references are to the Penal Code.

[2] The court also ordered defendant to pay additional restitution to Rachel E. and her mother, Mary E. ; those smaller amounts are not at issue in this appeal.

2

of driving with a blood alcohol content (BAC) of .08 percent or greater causing injury, in violation of Vehicle Code section 23153, subdivision (b). As to both counts, he further admitted that he had personally inflicted great bodily injury on a victim, in violation of section 12022.7, subdivision (a), and caused bodily injury to more than one victim, in violation of Vehicle Code section 23558. Defendant stipulated that there was a factual basis for his guilty pleas, based on the evidence at the preliminary hearing.[3] The evidence at the preliminary hearing established that defendant was intoxicated when he drove into a Mack truck parked at the side of Evans Avenue in San Francisco. Defendant collided into the truck with such force that the front passenger wheel of the truck was pushed onto the sidewalk. Defendant's car was almost completely crushed as a result of the collision, with significant damage everywhere but the trunk, and Rachel E. was severely injured, with the responding officer noting that her left arm was visibly bent at a non-joint area between the elbow and shoulder. Rachel E. was found lying in the back seat of the car, with her whole body sideways and her head pointing toward the passenger side. Passenger Daniel P. was found across the center console of the car, with half his body in the back seat of the car and the other half in the front.

Based upon defendant's pleas and admissions, the trial court suspended imposition of sentence and placed defendant on

---

[3] As this appeal concerns the propriety of the trial court's restitution order, we summarize the facts only as necessary to address the issues on appeal.

3

probation for a period of five years with various conditions. At the sentencing hearing, the court made a general order of restitution and reserved jurisdiction to determine the amount.

*Rachel E.'s Injuries*

Rachel E., who was twenty years old at the time of the incident, permanently lost use of her left arm. Rachel E. also suffered a severed vein in her heart, multiple fractures to her spine and neck, and severe injuries to her left leg.

By the time of the sentencing hearing, which was three years after the accident, Rachel E. had undergone 22 surgeries and had been in four hospitals for a total of 112 days—including 33 days in ICU and 17 days in a medically-induced coma while on a ventilator. She had medical hardware implanted in various parts of her body and suffered permanent nerve damage and a foot drop in her left leg. She was required to wear a brace on her left leg, and could not leave her home for more than a few hours a day. She was unable to work because she had not yet adapted to life skills she could accomplish with one arm.

As of 2019 (approximately six years after the accident), Rachel E. had undergone two additional surgeries and her left leg had recently broken due to weakness. Her recovery from the broken leg lasted six to seven months. As of late 2020, she estimated that she could walk or bear weight on her left leg for less than 3 hours a day. She stated that no improvements in her health or prognosis were expected, and that if anything, her left leg was expected to further weaken. Rachel E. could not feel her left arm, and said it "just hangs at [her] side." She had a

4

compromised immune system and was expected to need additional surgeries for the rest of her life.

*Restitution Briefing*

As noted, at the August 2016 sentencing hearing, the court made a general order as to victim restitution, reserving jurisdiction to determine the amount. After numerous continuances , the People filed a February 2019 brief seeking $3,861,367.50 in restitution for Rachel E.'s lost future earnings, which represented the lifetime earnings of a San Francisco public school teacher over the course of a career from the age of 22 to a retirement age of 67, with a "modest 2% annual growth." To support that request, the People submitted a physician's declaration of presumptive disability based on Rachel E.'s longstanding bed confinement and "immobility without a wheelchair, walker, or crutches"; salary information from the San Francisco Unified School District (SFUSD); and a chart showing a calculation of 45 years of teacher earnings with the 2 percent increase. As an alternative calculation, the People suggested a lost wages restitution amount of $2,250,601.29, which was based on the lifetime earnings of an individual earning minimum wage in San Francisco ($15/hour), at the same 2 percent annual growth over a 45-year career.

Defendant submitted a brief opposing the People's restitution request, arguing that the amount sought was "unsupported" and should be reduced based on Rachel E.'s comparative negligence. As to the latter point, he first contended that Rachel E.'s "negligent act of electing to not to utilize her

5

seatbelt contributed to her injuries and restitution owed [to Rachel] by Mr. Soriano should reflect this." Citing his own declaration, the declaration of passenger Daniel P., Vehicle Code section 27315, subsection (e), BAJI No. 5.90[4], and a variety of cases discussing expert testimony in civil cases involving the "seat belt defense," defendant argued that "we can assume that [Rachel E.'s] injuries would have been significantly less severe had she been wearing a seatbelt." Defendant also argued that the restitution amount "should reflect" that Rachel E. allegedly contributed to her own injuries in two additional ways: first, by getting into a car with defendant, knowing that he had been drinking to excess; and second, by "bringing alcohol into the car and encouraging [defendant] to drink, knowing that [defendant] was already intoxicated." Although defendant acknowledged that "[e]xpert testimony has been deemed necessary when a plaintiff has suffered severe, complex, and permanent injuries that are difficult to apportion between the collision and the failure to wear seat belts," defendant did not submit an expert declaration or

_____

[4] Vehicle Code section 27315, subdivision (e) provides: "A person 16 years of age or over shall not be a passenger in a motor vehicle on a highway unless that person is properly restrained by a safety belt." BAJI No. 5.90, the "Seat Belt Defense" jury instruction used in civil cases, states: "If you find that a seat belt was available to plaintiff and that plaintiff violated Vehicle Code § 27315, you may consider those facts in determining whether plaintiff exercised ordinary care under the circumstances. Evidence whether a party conformed to the seat belt law is relevant to that issue and ought to be considered, but is not necessarily controlling."

other evidence in support of his claim that Rachel E.'s allegedly negligent acts contributed in some way to her injuries.

The People submitted a September 2020 reply brief, which included a declaration from Rachel E. contradicting defendant's claim that she was not wearing a seat belt while he was driving. She stated that defendant was "driving really recklessly" and she "didn't see the crash happening, [she] just felt pain all over." She did not feel thrown anywhere. Rachel E. remembered trying to move and believed she was trying to get out of the car, but her "whole left side couldn't move." She stated, "If my seat belt was not on when the medics got me out of the car, it must be because I took it off trying to get out."[5] She believed she was pinned in the car. Rachel E.'s declaration further refuted defendant's claim that she had brought alcohol into defendant's car and knew he was drunk before he started driving, stating that she did not know he was drunk until "he started to drive crazy." The People also argued extensively against application of the doctrine of comparative negligence.

*Hearings and Order*

The trial court heard argument on the People's restitution request over the course of several hearings in December 2020 and January 2021. The court commented that even "assuming this was an extraordinary case where [Rachel E.'s] fault reached the level that we should even begin to think about [the comparative fault doctrine]," the underlying facts as to Rachel E.'s actions

---

[5] In the recording of the 911 call, the caller repeatedly tells the "screaming, female passenger" not to move "too much."

7

were "quite disputed." The court further noted that it was not sure whether Rachel E.'s alleged actions rose to level of victim negligence in *People v. Millard* (2009) 175 Cal.App.4th 7 (*Millard*) and that there were issues as to "how to value [Rachel E.'s] inability to work." The court suggested that the parties begin their arguments "with the legal question of whether or not we should even be talking about comparative fault," stating that, "to make it simple," the parties should assume the disputed facts about Rachel E.'s conduct because if "comparative fault still wouldn't be triggered" based on those alleged facts, there would be "no need to sit here and litigate the truth or falsity of those facts."

Defendant's counsel responded, "I agree. That's a threshold issue." Counsel continued, "So then the question before the Court is whether this was an extraordinary circumstance" justifying the application of the comparative fault doctrine. After hearing from both sides, the trial court stated that it did not believe that "wearing a seatbelt or not actually rises to the level of extraordinary circumstances under *Millard*, that I'm required to find," and therefore stated that it "did not believe that comparative fault is appropriate as a legal analysis here on the basis of the underlying facts that would give rise to it."

The court then turned to the question of how to calculate the amount of Rachel E.'s lost wages and the uncertainty as to various questions in that regard, such as Rachel E.'s ability to work, in what type of job she might be able to work, and for how many years of her life she might be able to work. The court felt

8

that it did not yet have sufficient information to make a rational calculation with respect to lost wages, and set another hearing date.

The court subsequently received additional exhibits from the People relating to Rachel E.'s ability to work, including an updated statement from Rachel E.  At the time of the incident, Rachel E. had completed one year of college classes and was working toward her degree, with a goal of becoming a teacher like her mother.

She had not previously worked for pay (even at a part-time job), although she had helped in her mother's classroom on a volunteer basis.  In 2018 or 2019, Rachel E. began working with Ticket to Work, an agency that facilitates employment for people with disabilities.  Despite going through the intake process, working with a series of case workers, and creating a resume with Ticket to Work, she had received no job referrals or job offers as of December 2020.  Rachel E. found this demoralizing, and although she believed herself capable of working 20 hours a week from home (perhaps doing a "telephone job" or data entry), she felt "distraught" and "hopeless" about the prospect of ever holding a job.  Her leg was permanently disabled, her arm was "destroyed," and she felt her "career prospects were, too."  Rachel E. was seeking restitution in the amount of the salary a public school teacher would have earned until retirement, as that was the career she would have pursued and was "taken away from her— completely—by the crime."

At the next hearing, the trial court reiterated the need to make a rational calculation of lost wages given certain "unknowable" things, such as when Rachel E. "might make peace" with "the fact that her life is tragically not what it should have been," and "when more part-time jobs for very disabled people are going to open up." The court initially stated that it seemed unfair to give Rachel E. a teacher's salary because there was no way of knowing whether she would have achieved that goal, and stated that it was considering awarding lost wages restitution in the amount of minimum wage until the age of 70. After the defendant objected to that intended calculation (but admitted it had no evidence regarding issues such as Social Security disability benefits as a potential offset), the court ultimately ruled that the most rational way to calculate Rachel E.'s lost wages would be to award her 25 years of minimum wage, and the remainder at 50 percent of minimum wage until age 67 (on the theory that she might in the future be able to find a job working part-time). Immediately prior to so deciding, the court specifically noted: "I would not [] rule today if I thought that I didn't have all the information that I needed [or] that if I was in any way prejudicing Mr. Soriano, but I also think it's fair to say that everyone has been given ample opportunity to put any additional information in front of this Court and there isn't any."

## DISCUSSION

## I. Restitution – Governing Legal Principles

"In 1982, California voters amended the state Constitution by way of initiative which established a new constitutional right

10

for crime victims to obtain restitution for losses suffered as a result of a criminal act and directed the Legislature to enact laws empowering the trial courts to issue such orders. Article I, section 28, of the California Constitution provides, '(b) Restitution. It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer.' " (*People v. Mearns* (2002) 97 Cal.App.4th 493, 498.) Section 1202.4 implements that constitutional mandate (*Mearns, supra*, at p. 498.), and provides in pertinent part: "It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) The court "shall order full restitution" to a victim in "a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (§ 1202.4, subds. (f) & (f)(3)[6].)

---

[6] When *Millard, supra*, 175 Cal.App.4th 7, discussed at length by the parties and in sections I and II, *post,* was decided, section 1202.4, subdivision (f) provided that " '[t]he court shall order full restitution *unless it finds compelling and extraordinary reasons for not doing so.*' " (*Millard*, at p. 25, quoting former § 1202.4, subd. (f), italics added.) The version of section 1202.4, subdivision (f) in effect at the time of the restitution hearings in this case did not contain the phrase "unless it finds compelling and extraordinary reasons for not doing so," (former § 1202.4, subd. (f), Stats. 2018, ch. 142), nor does the current version of the statute. (§ 1202.4, subd. (f).) Because there is no significant

11

"At a restitution hearing, the People carry the initial burden of demonstrating the amount of the victim's economic loss.  [Citations.]  Their showing establishes the amount of restitution the victim is entitled to receive, and the burden shifts to the defendant to prove by a preponderance of the evidence that the loss is other than that claimed."  (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 788.)  "[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole."  (*People v. Baker* (2005) 126 Cal.App.4th 463, 470.)  Importantly, " '[t]here is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action.' " (*Millard*, *supra*, 175 Cal.App.4th at pp. 26–27, quoting *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.)

We review a restitution order for an abuse of discretion. (*Millard*, *supra*, 175 Cal.App.4th at p. 26.)  "No abuse of that discretion occurs as long as the determination of economic loss is reasonable, producing a nonarbitrary result."  (*People v. Giordano* (2007) 42 Cal.4th 644, 665 (*Giordano*).)  " ' "A victim's restitution right is to be broadly and liberally construed."  [Citation.] " 'Where there is a factual and rational basis for the amount of

difference between the current version of section 1202.4, subdivision (f) and the one in effect at the time of the restitution hearings in this case, we cite the current version for purposes of clarity.

restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " [Citations.] . . . 'In reviewing the sufficiency of the evidence [to support a factual finding], the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." [Citations.]  Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt.' " (*Millard*, at p. 26.)

In addition, it is the "well established rule in this state that 'an appellate court will never indulge in presumptions to defeat a judgment.  It will never presume that an error was committed, or that something was done or omitted to be done which constitutes error.  On the contrary, every intendment and presumption not contradicted by or inconsistent with the record on appeal must be indulged in favor of the orders and judgments of superior courts.' " (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373; accord, *Giordano, supra,* 42 Cal.4th at p. 666.)  Accordingly, the appellant bears the burden of affirmatively establishing prejudicial error that requires reversal.  (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527-528; Cal. Const., art. VI, § 13; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, p. 409 [presumption of correctness; "error must be affirmatively shown"].)

## I.  Comparative Fault

To support his contention that the trial court erred, defendant relies extensively on *Millard, supra,* 175 Cal.App.4th

13

at p. 13, where the court "conclude[d] a trial court may apply the doctrine of comparative negligence in awarding victim restitution against a criminally negligent defendant when the court finds the victim's contributory negligence was a substantial factor in causing his or her injuries." In that case, as here, the defendant was convicted of violating Vehicle Code section 23153, subdivision (a). (*Millard*, at p. 13.) In a case of first impression, the *Millard* court held that the trial court did not abuse its discretion in applying the doctrine of comparative fault to reduce the section 1202.4, subdivision (f) restitution award by 25 percent to account for the victim's own negligence in driving his motorcycle at an unsafe rate of speed, taking no evasive maneuvers, and essentially driving " 'straight into the defendant's car without even a minimal amount of avoidance taken.' " (*Millard, supra,* at pp. 36–39, 41–42.) The court explained that section 1202.4, subdivision (f)(3) "should be interpreted as requiring a criminally negligent defendant to reimburse a victim only to the extent his or her criminal conduct caused the victim's economic losses, thereby implicitly allowing the application of the doctrine of comparative negligence to preclude restitution to the extent the victim's own negligence was a cause of his or her injuries. A criminal defendant is required to reimburse his or her victim only for those economic losses suffered 'as the result of the defendant's criminal conduct.' (§ 1202.4, subd. (f)(3).) If the doctrine of comparative negligence were not applicable, a criminally negligent defendant could be required to reimburse a victim for economic losses that were

14

comparatively the result or the fault of the victim's own negligence." (*Millard,* at pp. 39 & 41 [applying the doctrine of "comparative negligence holds a criminally negligent defendant responsible for the full amount of the victim's economic losses that resulted from the defendant's proportionate fault. In such circumstances, we do not believe the application of comparative negligence is contrary to either the express provisions or the purposes of [California Constitution, article I, section 28] and Penal Code section 1202.4. The victim will still receive full reimbursement for economic losses attributable to the criminally negligent defendant's offense (i.e., in proportion to the defendant's fault in causing the victim's losses)"].)

In the course of this reasoning, *Millard* also stated: " 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.' " (*Millard, supra,* 175 Cal.App.4th at p. 26, brackets in original.) And as noted above, *Millard* made clear that " '[t]here is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action.' " (*Id.* at pp. 26–27, quoting *People v. Carbajal, supra,* 10 Cal.4th at p. 1121.)

We agree with defendant that the trial court may have misunderstood *Millard* to the extent the court believed it was required to find "extraordinary" circumstances before considering

application of the comparative fault doctrine. *Millard* stated that "a trial court need not first find such 'compelling and extraordinary reasons' as a prerequisite to application of the doctrine of comparative negligence in exercising its discretion in determining the amount of Penal Code section 1202.4 victim restitution a criminally negligent defendant must pay." (*Millard, supra,* 175 Cal.App.4th at p. 42, fn. 16.)\* But that error in the trial court's reasoning does not compel reversal, because *Millard* does no more than hold that a court *may* apply the doctrine of comparative negligence in determining section 1202.4 restitution when a court finds that a victim's contributory negligence was a substantial factor in causing his or her injuries, and a defendant sustains his burden of proving that the loss caused by the defendant's criminal conduct is other than the amount established by the prima facie case. (*Millard,* at pp. 13, 26.) *Millard* did not hold that a trial court was required to apply principles of comparative fault whenever a defendant baldly asserts that the victim's conduct was a substantial factor that caused the victim's injuries in some unspecified way.

Here, although defendant contended that Rachel E. engaged in contributory negligence by, e.g., drinking with defendant and not wearing a seatbelt (alleged conduct that Rachel E. factually disputed), in his briefs before the trial court and in his arguments during the several restitution hearings he never explained which of, or to what degree, Rachel's many injuries were purportedly attributable to her conduct, nor did he

\*

16

ever attempt to assign a percentage of the claimed losses to Rachel E.'s alleged negligence. Instead, without benefit of testimony or a declaration from an expert (such as the accident reconstruction witnesses in *Millard, supra*, 175 Cal.App.4th at pp. 15–16), he offered only the conclusory assertion that the restitution amount "should reflect" Rachel E.'s alleged contributory negligence—based on some unexplained theory of causation and in some unstated percentage.

Defendant implicitly acknowledges this failing when he argues on appeal that the trial court misapplied *Millard* and "as a result, it abused its discretion in ordering restitution that was *potentially* well beyond the economic losses she incurred 'as a result of' Soriano's drunk driving." Put simply, if defendant does no more than show that the trial court "potentially" may have erred in determining the restitution amount, he has failed to establish the requisite prejudice entitling him to reversal. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1545 [defendant failed to sustain burden of rebutting victim's claimed amount of loss; "[i]f defendant believed supporting documentation or additional information was necessary to effectively rebut the amount claimed, it was up to her to obtain it. Having failed to do so, she did not meet her burden of proof"]; cf. *Soto v. BorgWarner Morse TEC, Inc.* (2015) 239 Cal.App.4th 165, 202 [comparative fault doctrine is a flexible concept allowing trier of fact to consider and evaluate the relative responsibility of various parties for an injury to arrive at an equitable apportionment or allocation of loss; "[t]he defendant bears the burden of

17

establishing that some nonzero percentage of fault is properly attributable" to others]; *Phipps v. Copeland Corporation LLC* (2021) 64 Cal.App.5th 319, 332–335 [defendant failed to sustain burden of proving jury's apportionment of fault was " 'illogical, unfair, and unsupported by evidence' " for several reasons, including that jury was " 'permitted to consider the relative culpability of the parties in assessing comparative fault' "].)

Defendant resists this conclusion by arguing that expert testimony is not always necessary in cases where a defendant seeks to limit its restitution exposure by pointing to the injured party's failure to wear a seat belt. While that is an accurate statement of a legal proposition, the cases cited by defendant are factually distinguishable. In *McNeil v. Yellow Cab Co.* (1978) 85 Cal.App.3d 116, 118, the court held that expert testimony was not required to establish causation "on the record before us," where the plaintiff admitted he was not wearing a seat belt, and "the impact of the collision threw him from the right rear seat of the taxicab to its left front area where his head and arm struck some objects with the result that, presumably among other injuries, he broke an arm." In *Lara v. Nevitt* (2004) 123 Cal.App.4th 454, 458 (*Lara*), not only did Nevitt offer testimony from an orthopedic expert that "if Lara had been harnessed, it would have been less likely that he would sustain significant neck injuries," the record established that a seat belt in the compartment of the truck where Lara was sleeping, unbelted, "prevented a sleeping passenger from moving at all." There was no similar evidence before the trial court in this case,

18

where Rachel E.'s body remained in the back of the car where she was seated, and there was no obvious connection between her injuries and the alleged lack of seat belt.

*Franklin v. Gibson* (1982) 138 Cal.App.3d 340, cited by defendant and discussed in *Lara*, makes clear the flaw in defendant's position. In *Franklin*, the court reversed the jury's "mysterious[]" findings that the two injured plaintiffs' failure to wear seat belts contributed to 30 percent and 35 percent of their injuries, explaining that defendant's failure to offer any expert testimony meant that the jurors' "verdict is explicable only as a guess, since the jury was not guided by evidence." (*Id.* at p. 344.) The court held, "Where the defendant raises the issue of the contributory negligence of the plaintiff for his failure to use available seat belts, expert testimony is necessary to establish *the nature of the injuries the plaintiff would have sustained if he had used seat belts*," because it was defendant's burden to prove "what injuries plaintiffs would have sustained, according to expert testimony, if the seat belts had been used." (*Id.* at pp. 343–344, italics added.) *Lara* noted that the plaintiffs in *Franklin* "suffered severe, complex and permanent injuries that were difficult to apportion between the collision and the failure to wear seat belts," and the defendant failed to prove "what the consequences to plaintiffs would have been if they had been wearing seat belts." (*Lara, supra,* 123 Cal.App.4th at p. 460 [discussing *Franklin*].) In those circumstances, *Lara* explained, the *Franklin* court appropriately "reversed the jury's apportionment of liability to plaintiffs because there was no

19

evidence that certain injuries were aggravated or made worse by plaintiffs' failure to use available seat belts," which rendered "the jury's apportionment of negligence to plaintiffs [] sheer guesswork." (*Ibid.*)

The cases on which defendant relies thus serve to demonstrate the consequences of his failure to submit any evidence supporting his contention that "not wearing a seatbelt contributed *in some proportion* to the severity of [Rachel E.'s] own injuries." Like the victims in *Franklin* (and unlike those in *McNeil* and *Lara*), Rachel E. suffered injuries were unquestionably severe, complex, permanent, and difficult to apportion between the impact of the collision and her alleged failure to wear seat belts. (*Lara, supra,* 123 Cal.App.4th at p. 460 [discussing *Franklin*].) On this record, defendant's appeal is doomed by his failure to present any evidentiary support for his assertion that Rachel E.'s alleged negligence contributed to her injuries.

In sum, we reject defendant's contention that the restitution award "should be reversed and the matter remanded to the trial court to determine what proportion, if any, of Rachel's injuries were caused by her own negligence." Remand here would be fruitless, because defendant failed to present the trial court anything beyond his repeated assertion that the restitution amount "should reflect" that Rachel's alleged negligence contributed to her injuries in some unspecified way. Defendant has failed to show prejudice from the trial court's claimed

misapprehension of *Millard* and the comparative fault doctrine, and there is no basis for his requested reversal and remand.[7]

## II. Amount of Restitution Award

Defendant also argues that the trial court abused its discretion in determining the lost wages to which Rachel E. was entitled, claiming that there was no rational basis for the restitution amount. This argument is meritless.

While the trial court acknowledged the seemingly obvious point that there were certain "unknowable" factors relevant to calculating a precise lost wages amount, such as when Rachel E. might overcome the emotional difficulties associated with her injuries and find a job she could do, the restitution amount it awarded was in no way arbitrary or irrational. (*Giordano, supra,* 42 Cal.4th at p. 665; *Millard, supra,* 175 Cal.App.4th at p. 26.) The court's restitution determination was supported by evidence as to Rachel E.'s education and plans prior to the incident; the permanent and ongoing injuries that continued to severely limit Rachel E.'s ability to work or leave the house, nearly seven years after the accident; her statement as to the efforts she had made with Ticket to Work (and the absence of any job offers, years after she began working with that agency); and her belief that she might be able to use her one good arm to work in some type of home-based job for a few hours each day. The trial court's lost wages determination was further supported by the People's proffered calculation based on the San Francisco minimum wage,

---

[7] In light of this conclusion, we need not address the Attorney General's contention that *Millard* was wrongly decided.

21

multiplied by the annual number of working hours suggested by the United States Office of Personnel Management, with an assumed 2 percent annual growth in wages and a reasonable estimate that Rachel E. would have retired at age 67. . On this record, the court did not abuse its discretion by acting irrationally in calculating the lost wages amount.

## DISPOSITION

The order is affirmed.

BROWN, J.

WE CONCUR:

STREETER, ACTING P. J.
NADLER, J.[*]

*People v. Soriano* (A161929)

---

[*] Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.