Filed 9/19/25  Dumpit v. Green Leaf Payroll & Business Solutions CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| MICHELLE DUMPIT et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>GREEN LEAF PAYROLL & BUSINESS SOLUTIONS, INC. et al.,<br><br>Defendants and Appellants. | D083828<br><br><br><br>(Super. Ct. No. 37-2020-00023700-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Higgs Fletcher & Mack, John Morris and Steven M. Brunolli for Defendants and Appellants.

Haight Brown & Bonesteel, Arezoo Jamshidi; Tencer Sherman and Sam Sherman for Plaintiffs and Respondents.

Michelle Dumpit and Jonathan Daniel brought suit against their former employer, Green Leaf Payroll & Business Solutions, Inc. (Green Leaf) and its two majority shareholders, Kira Amundsen and Marc Rodriguez.

Dumpit and Daniel alleged Amundsen and Rodriguez fraudulently induced them to leave high-paying jobs at their shared former employer, failed to pay them while simultaneously misusing corporate funds, and then wrongfully terminated them.  After trial, the jury found in favor of Dumpit and Daniel on their claims for failure to pay wages, retaliation, breach of contract, and false promise.  The jury also found that Green Leaf engaged in this conduct with malice, oppression, or fraud.  The jury awarded Dumpit $60,000 in lost wages and $50,000 in emotional distress and awarded Daniel $84,000 in lost wages and $75,000 in emotional distress.  The jury also awarded Dumpit and Daniel $250,000 each in punitive damages.

On appeal from the ensuing judgment, Green Leaf challenges only the award of punitive damages.  It argues insufficient evidence supported the jury's punitive damages award because (1) there was no evidence of its financial condition at the time of trial and (2) the evidence concerning the company's value showed it was too low to support an award of $500,000.  For the reasons set forth below, we reject Green Leaf's arguments and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Rodriguez, Amundsen, Dumpit, and Daniel worked together at Paychex, a human resource services and payroll processing company.  Rodriguez was Dumpit's and Daniel's supervisor.  Dumpit, Daniel, and Amundsen all held sales roles at Paychex.

In 2018, Rodriguez and Amundsen decided to start a competing payroll company, Green Leaf, that would focus on providing services to employers in the cannabis industry.  In the ensuing year, Rodriguez and Amundsen began building Green Leaf and approached Dumpit and Daniel, who were also close friends, about joining their venture.

2

In April 2019, Rodriguez and Amundsen left Paychex and began working for Green Leaf full time. Daniel and Dumpit followed suit later that year based on Green Leaf's promise of certain compensation. Daniel testified he was promised compensation of $7,000 per month and Dumpit testified she was promised compensation of $10,000 per month. Daniel and Dumpit also became minority owners of Green Leaf. Dumpit invested $50,000 into the company in exchange for a 20% ownership stake, and Daniel was given a 10% ownership stake for his work for the company before he left Paychex.

Once Daniel and Dumpit joined Green Leaf and were no longer working at Paychex, they became concerned about Rodriguez's and Amundsen's handling of the company's finances. Neither Daniel nor Dumpit received any compensation in 2019 and they became aware that Rodriguez was using corporate funds for personal expenses. They also learned that cash received from the company's clients was missing. In early 2020, Daniel, Dumpit, and another minority owner, Tyler Priest, investigated the company's finances. They discovered Rodriguez had used corporate funds for his personal expenses, and confronted him and Amundsen.

At a meeting in February 2020, Daniel, Dumpit, and Priest explained to Rodriguez and Amundsen that their business practices needed to improve. Rodriguez and Amundsen responded no changes would be made and that Daniel and Dumpit were not a good fit for their business. Shortly after, Rodriguez, Amundsen, and Priest voted to remove Daniel and Dumpit as shareholders of Green Leaf.

In July 2020, Daniel and Dumpit filed suit against Green Leaf, Amundsen, and Rodriguez. The complaint alleged Amundsen and Rodriguez misused corporate funds and fraudulently induced Daniel and Dumpit to leave their lucrative jobs at Paychex to work for Green Leaf. Daniel and

3

Dumpit asserted claims for breach of fiduciary duty, fraud, violation of the Unfair Competition Law, failure to pay wages in violation of the Labor Code, wrongful termination, breach of contract, and retaliation. They also asserted a claim for punitive damages. The case proceeded to trial in February 2023, and, as relevant here, both parties introduced the expert testimony of forensic accountants concerning damages and the value of Green Leaf.

Daniel and Dumpit's expert, Steven Schenk, testified he was retained to value Green Leaf as of December 31, 2021, and to evaluate Daniel's and Dumpit's claims for unpaid wages. With respect to his valuation of the company, Schenk first testified generally about different business valuation approaches: (1) an asset-based approach, which he explained simply subtracts a company's liabilities from its assets; (2) an income approach, which typically measures a company's projected income on an annual basis, then discounts back to a present value; and (3) a market approach, which compares a company to other similar companies to estimate an appropriate valuation. Schenk explained that he used both market and income based approaches to value Green Leaf. He stated that because the company is service-based, it holds few assets, and thus, the asset-based approach would not yield an accurate valuation.

Schenk also explained there were two types of market valuation approaches, the revenue multiplier method and the Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA) method. The revenue multiplier approach looks at the revenue of similarly situated companies compared to the stock price or the sale price of the company to determine its value, while the EBITDA method compares a company's cash flow to its stock or sale price. Schenk used the revenue method to evaluate Green Leaf because the financial information that the company provided to the plaintiffs

4

in the discovery showed "they didn't make any money." Schenk, however, clarified that this did not establish the business had no value because of the importance of revenue to valuation and Green Leaf produced significant revenue.

Schenk testified he determined 1.1 to 1.2 times revenue was an appropriate valuation for Green Leaf based on available data from the marketplace. Schenk calculated the company's value as of December 31, 2021, as $2,691,914. Schenk also testified that he had reviewed the report of Green Leaf's expert, Paul Zimmer, and that his calculations using the same revenue multiplier approach were similar to Schenk's calculation. Zimmer used a multiplier of 1, rather than the 1.1 to 1.2 multiplier used by Schenk, resulting in just a slightly lower valuation of Green Leaf of approximately $2.5 million. Schenk also testified that the EBITDA approach used by Zimmer was problematic because it used a lower multiplier than what would be appropriate based on the data Zimmer examined. Finally, Schenk opined that the discounts that Zimmer applied to the value for lack of control and marketability were too steep.

During his testimony, Zimmer testified he was retained to value a 10% and 20% minority interest in Green Leaf as of May 31, 2022. Zimmer calculated value using each of the methods discussed by Schenk. He testified the book value of the company, i.e. the asset-based approach, was negative $255,631; under the income based approach, Zimmer found the value was $563,074; and under the market valuation approach, he concluded the value was $644,992. Zimmer also opined that after considering the totality of the circumstances and his calculations, as well as applying discounts for lack of control and marketability, the company's value on May 31, 2022 was $370,000. In Zimmer's opinion, the market valuation approach was the least

5

reliable approach because there was limited data about companies comparable to Green Leaf. Zimmer criticized Schenk's market valuation analysis as using companies that were not sufficiently equivalent to Green Leaf.

On cross-examination, Zimmer testified that in calculating the company's value, he assumed revenue of approximately $340,000 per month based on Green Leaf's financials from February, March, April, and May 2022.[1] From these figures, he projected revenue of $3.6 million, then applied a cash flow multiplier of 3.4% to arrive at a value of $563,074 under the income based valuation approach.

Before it began its deliberations, the jury was specifically instructed with respect to punitive damages. In addition to explaining that such an award was appropriate only if the jury determined the defendants engaged in conduct "with malice, oppression, or fraud," and defining those terms, the instruction explained: "There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors in determining the amount: [¶] (a) How reprehensible was Green Leaf Payroll & Business Solutions, Inc.'s conduct? In deciding how reprehensible Green Leaf Payroll & Business Solutions, Inc.'s conduct was, you may consider, among other factors: [¶] 1. Whether the conduct caused physical harm; [¶] 2. Whether Green Leaf Payroll & Business Solutions, Inc. disregarded the health or safety of others; [¶] 3. Whether Michelle Dumpit and Jonathan Daniel were financially weak or vulnerable and Green Leaf Payroll & Business Solutions, Inc. knew Michelle Dumpit

_____

[1]    Consistent with Zimmer's analysis, Rodriguez testified that Green Leaf's revenue for calendar year 2022 was "around four million."

6

and Jonathan Daniel were financially weak or vulnerable and took advantage of them; [¶] 4. Whether Green Leaf Payroll & Business Solutions, Inc.'s conduct involved a pattern or practice; and [¶] 5. Whether Green Leaf Payroll & Business Solutions, Inc. acted with trickery or deceit. [¶] (b) Is there a reasonable relationship between the amount of punitive damages and Michelle Dumpit and Jonathan Daniel's harm? [¶] (c) In view of Green Leaf Payroll & Business Solutions, Inc.'s financial condition, what amount is necessary to punish them and discourage future wrongful conduct?  You may not increase the punitive award above an amount that is otherwise appropriate merely because Green Leaf Payroll & Business Solutions, Inc. has substantial financial resources."

After the conclusion of trial, the jury returned its verdict in favor of Daniel and Dumpit.  In its special verdict, the jury found Dumpit and Daniel performed work for Green Leaf and that the defendants willfully failed to pay Dumpit and Daniel.  The jury also found in favor of Dumpit and Daniel on their claims for failure to pay wages, retaliation, breach of contract and false promise.  The jury awarded Dumpit $60,000 in lost wages and $50,000 in emotional distress and awarded Daniel $84,000 in lost wages and $75,000 in emotional distress.  In addition, the jury found that with respect to Daniel and Dumpit's claims, Green Leaf "engage[d] in conduct with malice, oppression, or fraud."  The jury awarded $500,000 against Green Leaf in punitive damages, divided equally between the plaintiffs.  Thereafter the court entered judgment in accordance with the verdict.

After judgment was entered, Green Leaf moved for judgment notwithstanding the verdict, asserting insufficient evidence supported the punitive damages award.  Specifically, Green Leaf argued there was no evidence concerning Green Leaf's financial condition that could support the

7

award.  Green Leaf also moved for a new trial on the grounds the punitive damages award was excessive.  Daniel and Dumpit opposed both motions. They argued there was sufficient evidence to support the award, pointing to Zimmer's testimony that Green Leaf's revenues were between $300,000 and $3[4]0,000 per month, and that the company's profit and loss statements were not reliable because the payroll expenses had been manipulated to show a negative profit to avoid tax liability.

After a hearing, the trial court denied both motions.  The court found sufficient evidence to support the punitive damages award, and pointed to the experts' testimony, specifically Zimmer's testimony concerning the company's monthly revenue.  The trial court also stated, "the jury received evidence concerning the company's financial condition and ability to pay beyond Green Leaf's profit and loss statements."

Green Leaf timely appealed.

DISCUSSION

I

*Legal Standards*

"Civil Code section 3294 provides, 'In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.' Here, [Green Leaf] does not challenge the [fact finder]'s decision that the evidence demonstrated [it] was guilty of oppression, fraud, or malice, that would justify punitive damages. [It] only challenges the amount of the award and the strength of the evidence considered by the [jury] in making the award." (*Doe v. Lee* (2022) 79 Cal.App.5th 612, 618 (*Doe*).)

" '[O]bviously, the function of deterrence … will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth … exceeds the level necessary to properly punish and deter.' " (*Doe, supra*, 79 Cal.App.5th at p. 619.) The "most important question is whether the amount of the punitive damages award will have deterrent effect— without being excessive. Even if an award is entirely reasonable in light of the other two factors …, the award can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone*." (*Adams v. Murakani* (1991) 54 Cal.3d 105, 111 (*Adams*).)

"Our Supreme Court has not prescribed a rigid standard for measuring a defendant's ability to pay. [Citations.] Accordingly, there is no one particular type of financial evidence a plaintiff must obtain or introduce to

9

satisfy its burden of demonstrating the defendant's financial condition. Evidence of the defendant's net worth is the most commonly used, but that metric is too susceptible to manipulation to be the sole standard for measuring a defendant's ability to pay. [Citations.] Yet the 'net' concept of the net worth metric remains critical. 'In most cases, evidence of earnings or profit alone are not sufficient "without examining the liabilities side of the balance sheet." [Citations.]' [Citations.] Evidence of a defendant's income, standing alone, is not ' "meaningful evidence." ' [Citation.] 'Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income.' " (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 194 (*Soto*).)

" ' "Without evidence of the actual total financial status of the defendants, it is impossible to say that any specific award of punitive damage is appropriate." [Citation.]' [Citation.] 'Thus, there should be some evidence of the defendant's actual wealth' [citation], but the precise character of that evidence may vary with the facts of each case." (*Soto, supra*, 239 Cal.App.4th at pp. 194–195; see also *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 915 (*Kelly*) [" ' "[n]et worth" is subject to easy manipulation and, in our view, it should not be the only permissible standard. Indeed, it is likely that blind adherence to any one standard could sometimes result in awards which neither deter nor punish or which deter or punish too much' "].) Additionally, "[t]he evidence should reflect the named defendant's financial condition at the time of trial." (*Soto,* at p. 195.)

"Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages. [Citation.] We examine the record to determine whether the challenged award rests upon substantial evidence. [Citations.] If it does not, and if the plaintiffs had a full and fair opportunity

10

to make the requisite showing, the proper remedy is to reverse the award." (*Soto, supra*, 239 Cal.App.4th at p. 195; see also *Kelly, supra*, 145 Cal.App.4th at p. 916 ["A substantial evidence standard of review applies, in which all presumptions favor the trial court's findings and we view the record in the light most favorable to the judgment."].) In addition, " '[o]ur review of punitive damage awards rendered at the trial level is guided by the "historically honored standard of reversing as excessive only those judgments which the entire record ... indicates were rendered as the result of passion and prejudice." ' " (*Kelly,* at p. 916.)

## II

### *Analysis*

Green Leaf asserts the punitive damage award must be reversed because there was no evidence of its financial condition at the time of trial and because Schenk's opinions on the company's value failed to take into consideration its liabilities. We disagree and conclude the punitive damage award was based on substantial evidence. While it is true that the most recent financial information presented to the jury was from eight months before the trial, this information was not so remote as to invalidate its accuracy.

In support of its assertion that the financial information presented to the jury was outdated, Green Leaf relies on *Kelly, supra*, 145 Cal.App.4th 910. In *Kelly*, the court found the defendant contractor liable for negligence and fraud after his workers caused a flood in the plaintiff's property. In addition to compensatory damages, the court awarded the plaintiff $75,000 in punitive damages after finding the defendant had a minimum net worth of $750,000. (*Id*. at p. 914.) The evidence supporting the award, however, was limited to statements the defendant and his sister made to the plaintiff that

11

the defendant owned two valuable properties. There was no evidence admitted at trial that the defendant still owned the properties, what the properties were worth, or whether the properties were encumbered by any liabilities. In reversing the award, this court held that while it was possible the defendant had "sufficient wealth that $75,000 would serve the deterrent purpose of punitive damages without bankrupting him, … there was simply a failure of proof and thus the award cannot stand." (*Id*. at p. 917.)

Unlike *Kelly*, where there was simply no evidence of the defendant's ability to pay the punitive damage award, here the jury was provided with specific detailed evidence concerning Green Leaf's value and its financial condition. Specifically, the company's own valuation expert, Zimmer, testified his valuation considered the most recent financial information that was available, including the company's tax returns from 2018 to 2021, and financial statements prepared by the company through May of 2022, the year before trial began.[2] As Dumpit and Daniel point out in their briefing before this court, Zimmer testified that the financial statements provided by Green Leaf (and admitted into evidence) showed that in 2022 the company was generating revenue between $300,000 and $340,000 per month and Rodriguez similarly testified that Green Leaf brought in approximately $4 million in revenue in 2022.[3]

In addition, the plaintiffs' expert, Schenk, testified extensively about his valuation methodologies and how he arrived at a value for the company of

---

[2]    Those documents were also entered into evidence.

[3]    Green Leaf filed two motions to augment the record on appeal to include its 2020 and 2021 tax returns, and certain financial statements from 2018, 2019, and 2022 that were admitted into evidence at trial. The unopposed motions are granted.

approximately $2.6 million as of the end of 2021. Contrary to Green Leaf's assertion, Schenk's valuation method took into consideration Green Leaf's liabilities. Further, there was evidence, which the jury appropriately accepted, that the company manipulated its financial statements through its payroll to reflect a negative profit and avoid tax liability. Zimmer himself testified Green Leaf's practice of intentionally driving down its profit was "quite usual for" such a business.

In sum, we reject Green Leaf's claim that there was insufficient evidence to support the jury's punitive damage award. The evidence showed Schenk used an accepted methodology to value the company at $2.6 million, the company had revenue of approximately $4 million the year before trial, and the profit and loss statements showing a lack of profit was a function of the company's manipulation of its payroll liability, and not a result of its liabilities overwhelming its assets. Accordingly, the award of $500,000 was supported by the evidence before the jury.

Green Leaf also argues the $500,000 punitive damage award must be reversed because it is greater than 10% of the value of the company, which Green Leaf asserts was "no more than $560,000." As an initial matter, we do not agree with Green Leaf that an award greater than 10% of a company's value is per se improper. As discussed, the "California Supreme Court has declined to prescribe any particular standard for assessing a defendant's ability to pay punitive damages." (*Kelly, supra*, 145 Cal.App.4th at p. 915.) "[W]hether a given percentage of net worth is excessive" cannot be distilled to a formula, rather "each case must be decided on its own facts, considering … various indicators of wealth." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 625; see also *Adams, supra*, 54 Cal.3d at p. 116, fn. 7 ["We decline … to prescribe any rigid standard for measuring a defendant's ability to pay.].)

13

Zimmer's valuation of the company as no greater than $560,000 was contradicted by Schenk's opinions that Zimmer significantly undervalued Green Leaf, and that the company was worth far more. As discussed, Schenk's opinions were supported by Green Leaf's tax returns, financial statements, and Rodriguez's and Zimmer's testimony about the company's substantial revenue in 2022. While the punitive damage award was high, it was not outside the bounds of reasonableness, and Green Leaf makes no claim that it was awarded as a result of the jury's passion or prejudice. (See *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 391 ["there is a range of reasonableness for punitive damages reflective of the fact finder's human response to the evidence presented"].)

## DISPOSITION

The judgment is affirmed. Respondents are awarded the costs of appeal.

McCONNELL, P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.

14